Stephen WEINREICH, Plaintiff,

v.

Richard SANDHAUS, a/k/a Dick Sandhaus and Science Faction Corporation and Dick Sandhaus Productions, Inc., Defendants.

No. 83 Civ. 3966(RWS).

United States District Court, S.D. New York.

April 28, 1994.

Daniel Martin, Trenton, NJ, for plaintiff.

Gerald M. Kleinbaum, New York City, for defendants.

## *OPINION*

SWEET, District Judge.

This action by plaintiff Stephen Weinreich ("Weinreich") against defendants Richard Sandhaus ("Sandhaus"), Science Faction Corporation ("SFC") and Dick Sandhaus Productions, Inc. ("DSPI") (collectively the "Defendants") was tried before the Court for ten days, from January 5 to January 18, 1994. Upon all prior proceedings, the findings of fact and the conclusions of law, judgment will be entered on the complaint in the amount of $55,687.07 with interest and costs.

### *Prior Proceedings*

Weinreich commenced this action by the filing of a complaint on May 23, 1983 that alleged damages arising out of the collaboration of the parties on certain laser light show systems. Issue was joined and discovery proceeded.

In July 1987, an independent expert,[1] Brian O'Brien, was selected by both parties to assist the Court in resolving conflicts between Weinreich's discovery requests and

---

1. The universe of laser light show experts is quite small. Prior to being retained as the independent expert, O'Brien had sold some equipment to the Defendants, and may have done some consulting work for them as well. When he was retained, O'Brien disclosed to Weinreich these previous equipment sales to the Defendants, but may not have disclosed his prior consulting work.

the Defendants' need to protect confidential trade secrets and business information. O'Brien was charged with advising the Court if laser light show systems produced by the Defendants after 1980 were similar or derivative of the systems Weinreich worked on in 1978. O'Brien issued several reports, and amendments thereto, that concluded that the post–1980 laser light show systems were not similar or derivative of those Weinreich worked on.[2] Consequently, Weinreich was not entitled to discovery about these post–1980 systems.

On July 24, 1989, the Honorable Charles E. Stewart of this Court dismissed Science Faction Systems from this action. In addition, Judge Stewart granted the Defendants' motion for summary judgment dismissing Weinreich's first, second and third causes of action, which alleged a joint venture between the parties. Defendants' motion for summary judgment on the fourth and fifth causes of action, alleging *quantum meruit* and breach of contract respectively, was denied. On February 6, 1991, Judge Stewart adopted Magistrate Judge Naomi Reice Buchwald's Report and Recommendation that the Defendants' renewed motion for summary judgment on the fourth and fifth causes of action be denied. The action was assigned to this Court on December 22, 1993.

During the course of the trial in January 1994, twelve witnesses testified, two witnesses' deposition testimony were admitted in lieu of their trial testimony and numerous exhibits were admitted. Final submissions were completed on April 22, 1994, at which time the action was deemed submitted. The following constitutes the findings of fact and conclusions of law, as required by Fed. R.Civ.P. 52(a).

## Findings of Fact

Weinreich is a citizen of the State of New Jersey with a high school degree who has worked on various electro-mechanical design projects. Sandhaus is a resident of New York. SFC and DSPI[3] are both New York corporations engaged in various aspects of the entertainment business. Sandhaus is the sole shareholder and director of SFC and DSPI; he is also an officer, and has often been the only one. Sandhaus completely controls both SFC and DSPI.

In 1977, at the request of the rock band Foreigner, Sandhaus evaluated approximately eight entities in the United States and Europe that were creating laser light show systems. He concluded that those entities were not responsible and advised Foreigner not to deal with them. At about the same time, Dolgoff Holophase, Inc.—an entity that Sandhaus had an interest in—agreed to produce a laser light show system for Foreigner's 1977 tour. Sandhaus first met Weinreich through Dolgoff Holophase, and they and Michael Metz, an engineer and designer, worked together to produce this system. Because of its size, the system was known as the Elephant system. It was exhibited to Foreigner, but for a variety of reasons was not used during the 1977 tour.

Although Sandhaus was "personally humiliated" by the failure of the Elephant system, in late 1977 he approached Weinreich and Metz about working on another laser light show system for Foreigner's upcoming 1978 tour. This system became known as the Silver system. Weinreich was the principal mechanical designer for the laser projector; the electronic controls were manufactured by an independent contractor, 2005 A.D.

The Silver system had the following components: an external laser; slow, closed loop galvanometer scanners; a silver housing

**2.** The first report was issued by O'Brien on November 21, 1987, and was paid for by both Weinreich and the Defendants. An amended report was issued on May 31, 1989, and was paid for by Weinreich. Pursuant to a Court order, O'Brien issued a third report, and two supplements thereto, in 1992; these reports were paid for by Weinreich. In November 1992, over Weinreich's objections and not pursuant to any Court order, O'Brien issued a supplemental report on the laser truck. This report was paid for

by the Defendants. At trial, O'Brien appeared as one of the Defendants' experts, even though he held certain opinions that conflicted with their position. O'Brien anticipated being paid by the Defendants for appearing at trial.

**3.** DSPI was originally incorporated in Connecticut. In 1977 or 1978, it became a New York corporation.

structure that tilted by manipulating devices inside the structure; dichroic filters; polarization rotators; front surface mirrors; irises to limit the range of the laser scan; linear proportional solenoids; a three color channel; bathroom glass effects selected with a linear solenoid; a dimmer/blanker; and an electronic controller system. Various light effects were created by the Silver system, including rosette figures, color separation, dimmer and brighter light, and "washed" light.

Prior to April 1978, Sandhaus, Metz and Weinreich had several conversations about establishing a company to produce laser light show systems. The proposed company never came to fruition, and as a result Weinreich prepared a letter (the "1978 Letter") to govern his relationship with Sandhaus. The 1978 Letter was addressed to Sandhaus at DSPI, and provided:

> This will confirm our intention that all design work done by Stephen Weinreich for the laser light show currently in production is for the consideration of a 33⅓ interest in the net profit earned by sale or rental of this or similar or derivative systems at prices and conditions mutually agreeable to Sandhaus and Weinreich, such agreement not to be unreasonably withheld.
>
> Any funds drawn by Stephen Weinreich and charged against this project (other than expense reimbursements) will be considered as drawings on profits.
>
> This letter is not intended to be a complete agreement, but is to express the general intent of both parties and is to govern in this matter until such an agreement is executed.
>
> Your signature below indicates your agreement with these terms. Ex. 1.

The phrase in the 1978 Letter, "the laser light show currently in production," referred to the Silver system. On May 1, 1978, Sandhaus signed the 1978 Letter in his capacity as an officer of DSPI.[4]

In May 1978, the Silver system was completed and demonstrated to Foreigner. The demonstration was not successful, and the Silver system was not used on the Foreigner tour.

In June 1978, Sandhaus formed a second company, SFC. DSPI[5] and SFC shared common office space, but had separate bank accounts and ledgers, and filed separate tax forms. Neither DSPI nor SFC displayed any independent business discretion. For instance, in August 1978, Sandhaus wrote a letter on behalf of SFC on DSPI stationery. Similarly, SFC's advertising literature indicated that it was "an affiliate of DSPI." Moreover, at trial Sandhaus illustrated the interconnectedness of the Defendants and his domination of both entities.[6]

The same month that it was formed, SFC acquired the Silver system from DSPI. Although Defendants cite to an SFC ledger entry that shows that DSPI was paid $9,000.00, the transaction was accomplished without any papers. While the SFC ledger does indicate that the $9,000.00 entry was for capital equipment, it does not specifically identify the Silver system as the product that was purchased. In contrast, more detailed notes existed for all other entries on that page of the ledger. Moreover, Defendants do not dispute Weinreich's contention that the DSPI revenue ledger for that time was never produced. Sandhaus also claimed that as a result of the Silver sale, DSPI was credited for certain rent payments and other expenses. However, Defendants fail to cite any ledger entries in support of their contention.

4. Sandhaus alleges that he was compelled to sign the letter under duress because Weinreich threatened to withhold the Silver system. The evidence is to the contrary.

5. Although it still exists and continues to pay franchise taxes, DSPI has been dormant since 1980.

6. In explaining DSPI's and SFC's arrangements with other entities, Sandhaus stated: "I was the

subtenant ..." Tr. 791; "I agreed to provide not only the hardware ..." Id.; "So I marketed myself to him ..." Tr. 908. Similarly, at a pretrial deposition Sandhaus explained how the Silver system was transferred from DSPI to SFC: "I am the sole shareholder of both of those corporations, and I made a decision ... to establish [SFC, which] would deal only in the area of laser [business]." Ex. 1029, at 68.

During the remainder of 1978, the Silver system was used at a disco trade show, at the Waldorf Astoria on two occasions, at a Red Cross show in Palm Springs, Florida and at the Xenon disco. Weinreich does not dispute the Defendants' contention that the net costs of the Silver system exceeded its net income, with a total negative balance of $20,289.20.

Despite the problems with the Elephant and Silver systems, in the summer of 1978 Weinreich, Metz and Sandhaus started work on yet another system, the 2000 system. The components of the 2000 system were substantially the same as those in the Silver system, except for the following improvements: fast, closed loop galvanometer scanners; a black housing structure that tilted by manipulating devices outside the structure; rotary proportional solenoids; bathroom glass effects selected with a rotatable turret; and a computer controller system. Moreover, the basic optical path geometry of the Silver system was followed in the 2000 system.

Both the Silver and 2000 systems had a basic design function that was described by O'Brien:

> The [Silver] and 2000 . . . have fixed pairs of galvanometers. Each pair has a moving mirror on each galvo to steer the beam in each of two dimensions, up-down and left-right, but the galvos do not themselves move on their mountings. . . . the projection angle [of the two systems are] limited to only what the galvos can themselves alone produce, except when some auxiliary large external mirrors were employed to further direct the image. Ex. AF, at ¶ 11.

The first 2000 was delivered to the Xenon disco in the fall of 1978. By June 1979, there were approximately twelve 2000 systems in production.[7] In September 1979, Weinreich stopped working for the Defendants. Thereafter, SFC continued to rent and sell 2000 systems. Additional features for the 2000 system were also created.

In 1981, SFC put on a laser light show at the Empire State Building that involved a 2000 system that primarily projected vertically, as opposed to horizontally. An external motor driven mirror device was attached to the 2000 housing, thereby permitting the beam to scan nearly 360 degrees. However, continuous 360 degree rotations were not possible because the system's wires would get tangled as it turned. In addition, as the system moved over 360 degrees, the images it projected would end up being upside-down.

Sandhaus maintained contemporaneous ledgers of revenues and disbursements for SFC.[8] However, Sandhaus did not allocate revenues and disbursements among the SFC products until 1990, well after the initiation of this action. According to his allocations, for the period 1978 to 1981, total income for the 2000 system was $1,664,818.28, and total costs were $1,734,216.56, leaving a negative balance of $69,398.28. Weinreich adopted the income and cost figures for the 1978 to 1981 period as starting points, but urged corrections to support his damage claim.

An appropriate percentage of various overhead items that can be allocated to the 2000 systems is 66.95 percent, since this was the percentage of SFC's payroll that was allocated to that product. Based on this percentage, the following should be subtracted from the total cost of producing the 2000 system: (1) $26,384.61, representing the over-allocation of SFC tax penalties and interest that Sandhaus charged the 2000 system, (2) $43,-590.86 in payroll taxes, representing an over-

---

**7.** Pursuant to regulations enacted by the United States Food and Drug Administration's Bureau of Radiological Health—subsequently named the Center for Devices and Radiological Health—(collectively "BRH"), producers of laser light show systems were required to file certain information on the product, the company and its quality control procedures. Sometime in 1978, SFC filed an initial product report with the BRH concerning the Silver system. After the filing of an initial product report, information on new laser light show systems produced by the same company could be filed with the BRH as supplemental reports to the initial report.

In late 1978 or early 1979, SFC filed supplemental reports on the 2000 with the BRH. In 1980, SFC applied for and was granted a variance for the 2000. Thereafter, SFC used the 2000 family designation for its future filings with the BRH on other products.

**8.** Although there were three discrepancies in the ledgers, the entire set of ledgers will not be disregarded.

allocation of payroll taxes to the 2000 system, (3) $49,636.88 for an over-allocation of rent charged to the 2000 system,[9] (4) $24,575.70 for expenses that Sandhaus allocated to the 2000 system that SFC had already received as a credit in litigation with the rock band Kiss, and (5) $15,861.97 for over-allocations to the 2000 system of expenses that are generally not specific to any one product, including accounting services, insurance expenses, miscellaneous office expenses and a rent security deposit. In sum, the total over-allocation for the 2000 system from 1978 to 1981 was $160,050.02.[10]

The 2000 system income should also be increased by $3,410.00 for payments SFC received from the Xenon disco of $2,260.00 in sales tax income and $1,150.00 for a plexiglass case.[11]

SFC continued to rent and sell the 2000 until the summer of 1982. For the first five months of 1982, SFC received rental and sales income for 2000 systems totalling $82,875.00.

Beginning in 1981, SFC began to develop the 360 system, which was a significant departure from the Silver and 2000 systems. The 360 system could project a figure over 360 degrees without the image rotation problem associated with the Empire State Building project. As explained by O'Brien:

Unlike the [Silver or 2000 systems], which use one or several parallel pairs of fixed galvos for simultaneous projection from a stationary projector box, the new 360 series uses only one pair of galvos mounted in an elaborately articulated assembly. The galvos rotate in tilt motion as a pair together on a subassembly. In addition, this entire subassembly, rotates 360 degrees on the pan axis, hence the name 360 series. This technique enables coverage with an image on an entire hemisphere and slightly more, without external mirrors for projection to any part of this hemisphere. Ex. AF, at ¶ 12.

Consequently, the 360 system was, according to its designer, Stephen Schultz, a "fundamentally new approach, not a slight extension" of the Empire State Building project. Tr. 500. Indeed, Weinreich's expert, Leo Beiser, admitted that the design change in the 360 system was a "fundamental one."

The 360 system was first used at the Knoxville Worlds Fair, which began in May 1982. At that time, three of the four then existing 360 systems were used in Knoxville. The fourth was used for a July 4th show at New York Harbor. Thereafter, except as noted below, SFC used the 360 systems for its future rentals and sales; it no longer used systems similar or derivative of the Silver or 2000 systems.

The indoor show at the Knoxville Worlds Fair used a system that was one-quarter derived from the 2000 system. O'Brien stated that the amount of derivation for this system was "probably less than half but more than a trivial portion." As noted, the Knoxville show also used three 360 systems

---

9. SFC and DSPI shared office space. However, DSPI was far less active than SFC before 1980, and thereafter it was dormant. Accordingly, it is appropriate that SFC pay four-fifths of the total rent for the office space, and that the 2000 system pay 66.95 percent of that amount.

10. Weinreich also contends that there were other over-allocations. The evidence does not support Weinreich's contentions with respect to three items. The first is the $262,508.35 for production of the 2000 system from June, 1980 to December, 1981. Sandhaus acknowledges that there were no 2000 systems fabricated during this time. Weinreich thus contends that it was inappropriate to allocate *any* money for production, even though the 2000 systems continued to be rented during this time. However, there were expenses related to renting the 2000 systems. Although employees handled some of these tasks,

outside entities did as well. Moreover, during this time Sandhaus also paid certain bills incurred previously for the fabrication of 2000 systems. The second item is $17,573.16 in capital equipment as to which there was no evidence that these expenses were not used for the 2000 systems. The third item is $32,248.65 in various expenses including telephone and telex charges and travel and trucking expenses which are not allocatable on a 66.95 percent basis, since no evidence was submitted to indicate that these charges were not for the 2000 systems.

11. Weinreich also claims that an additional $4,000 should be credited to the 2000 system because SFC received an on-screen credit in part payment for a rental. The Court will not credit the 2000 system with this amount since no evidence was introduced about the fair value of an on-screen credit.

outdoors. The total rental for all systems was $410,000.00. The evidence also shows that a system similar to the Knoxville indoor system was used in Sao Paulo, Brazil in April 1983. The total rental for that show was $55,000.00.

For SFC income received after May 1982, $5,334.88 received from Palace Management was for a prior 2000 system sale.[12] A 2000 system was also used—together with a 360 system—at the New York Harbor show on July 4, 1982. SFC received $15,000.00 for this show. For this period, a fair cost is 75 percent of total income, based on the income and costs of the 2000 digital product.[13]

Weinreich was also involved in projects other than the Silver and 2000 systems for the Defendants. In early 1978, Weinreich participated in the design of a centerfold for Foreigner. For this project he was paid $500.00. Weinreich also worked on a commercial for Bulova, for which he was paid $250.00 for a day's work. In May 1978, Weinreich worked on a project called Laser Tinker Bell, which was designed and fabricated very quickly and was delivered to the client in Philadelphia. Weinreich was never paid for this project. In early 1979 and again in July 1979, Weinreich helped to prepare a trade show booth and brochure for SFC. He also attended one of the trade shows. Weinreich was not paid for this project. The same year Weinreich worked "a little bit" on a laser video report with Metz for SFC.

In March 1979, SFC and the rock band Kiss and its managing agent, Aucoin·Management, Inc., entered into a contract with SFC. SFC was to provide four laser and optical components for an upcoming tour by Kiss and received $130,000.00 upon the signing of the contract, and was to receive an additional $5,000.00 for each week of the twenty-six week tour. Weinreich and Metz

worked on the four components full time from March to June 1979. Metz was required to take a leave of absence from another job to do so, and was paid pursuant to an employment contract. Weinreich was paid $10,700.00 for the work he did on this project.

In June 1979, the project was demonstrated to Kiss in Lakeland, Florida. The project failed to perform, and Kiss did not take it on tour. At the time, SFC had nonetheless been paid an additional $10,000.00. Thereafter, litigation ensued, and SFC was required to return the $10,000.00 it had been paid in June. SFC, however, was entitled to retain the $130,000.00 that it previously received.

In the summer of 1979, Weinreich worked on several projects, including a color chopper, a beam stealer and a laser chaser. These were all intended to be components of the 2000 system. He was not paid for this work.

For all of these projects, Weinreich did not keep any time records nor did he ever bill Defendants for his services. Nonetheless, Weinreich maintains that he worked full time for Sandhaus from April 1978 to September 1979. During this period, Weinreich was paid approximately $14,875.00, which he considered to be a draw on his agreement to receive profits.

Weinreich's claim that he worked full time from April 1978 to September 1979 is not credible. For instance, Weinreich admitted that he did not work during the month of August 1979. Weinreich also admitted that from April 1978 to sometime that summer, he only worked twenty hours a week for the Defendants. In addition, Weinreich acknowledged that sometime before September 1979, he received $9,000.00 from other clients for several weeks of work. Finally, Weinreich's testimony at depositions and at trial concerning the amount of time he spent on particular

12. Weinreich also seeks to include monies received by the Defendants from the Brittania Beach Hotel, Palace Management and the Visage disco. Since these sums were merely related to the servicing of 2000 systems and for purchases

of other hardware, they are not included in the 2000 system income.

13. According to Sandhaus, for the 2000 digital products, costs were $250,736.93, and income was $1,017,124.49.

projects varied considerably.[14]

In September 1979, Weinreich quit working with Sandhaus. The following month, Weinreich wrote Sandhaus about commissions for bringing in new business. In the letter he noted that "a resolution of the question of the Metz, Sandhaus, Weinreich relationship has not yet been resolved." In 1980, Metz sued Sandhaus for an accounting of the alleged joint venture. Metz did not prevail because the court found that he did not have an agreement with Sandhaus concerning the joint venture. (*Metz v. Sandhaus*, No. 14941/80 (N.Y.Sup.Ct. June 20, 1984)).

At the end of May 1981, SFC moved its offices from Park Avenue to West 52nd Street in New York City. In the process of moving, SFC discarded various documents, including records concerning expenses and disbursements for the Silver and 2000 systems that related to the entries in the DSPI and SFC ledgers. Sandhaus testified: "I know a great deal was lost at that time in that move, a lot intentionally, because we had no place to put the stuff." No evidence was proffered as to the contents of these documents. Weinreich failed to establish that Sandhaus destroyed these documents for the purpose of preventing their use in current or future litigation, nor was any evidence adduced that invalidated the integrity of the ledgers.

### Conclusions of Law

■ This Court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332, and thus applies the choice of law rules of the forum state, New York. *Krauss v. Manhattan Life Ins. Co.*, 643 F.2d 98, 100 (2d Cir. 1981). Interest analysis is normally applied in New York to choice of law issues concerning contract disputes. *See Hutner v. Greene*, 734 F.2d 896, 899 (2d Cir.1984). In this case such analysis is not required since the parties have assumed that New York law applies by relying on it to support their arguments. *See Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984) (in New York, "in the absence of a strong countervailing policy, the parties to litigation may consent by their conduct to the law to be applied"). Accordingly, the Court will apply New York law.

### I. The 1978 Letter is an Enforceable Contract

Defendants initially argue that the 1978 Letter is not a binding contract, but rather is only a letter of intent.[15] An analysis of preliminary agreements such as this one begins with the Honorable Pierre N. Leval's opinion in *Teachers Ins. & Annuity Assoc. v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987). *See also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989). There are two types of preliminary agreements. In the first, the parties have come to an agreement on all the issues that require negotiation. "Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement." *Tribune Co.*, 670 F.Supp. at 498. *See also V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) ("the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event"). This type of agreement could be referred to as a binding preliminary agreement.

---

14. Weinreich's reliance on the testimony of Metz and Schultz on this point is also not persuasive. Metz, who also sued the Defendants, testified that he spent about 2000 hours working for the Defendants, and that a significant amount of that time was spent with Weinreich. However, a substantial part of their collaboration was spent working on the Silver and 2000 systems and the Kiss project, of which Weinreich is not entitled to any *quantum meruit* recovery. *See infra* section VI.

Schultz, in response to a question about how often he saw Weinreich at the Defendants' offices, testified: "If I had to try to remember and put an average on it, I think I would say 20 to 25 hours per week." Schultz, however, repeatedly testified that time frames were difficult for him to specify. Indeed, Schultz was unable to even state when he started working for the Defendants.

15. In 1982, in the Metz case, Sandhaus testified that the 1978 Letter was an agreement. At trial, Sandhaus testified that his deposition statement was incorrect.

The second type of preliminary agreement is termed a binding preliminary commitment. In this situation, the parties agree to an incomplete agreement but accept "a mutual commitment to negotiate together in good faith in an effort to reach a final agreement...." *Tribune Co.*, 670 F.Supp. at 498.

In the instant case, Weinreich contends that the 1978 Letter is of the first type, a binding preliminary agreement. The Second Circuit considers four factors in determining whether such an agreement exists. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75–76 (2d Cir.1984). The factors are:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing;

(2) whether there has been partial performance of the contract;

(3) whether all of the terms of the alleged contract have been agreed upon; and

(4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston*, 777 F.2d at 80.

The Second Circuit has at various times stated that "[n]o single factor is decisive, but each provides significant guidance." *R.G. Group*, 751 F.2d at 75. *See also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir.1993). But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important. *Arcadian Phosphates*, 884 F.2d at 72. *See also Argonaut Ins. Cos. v. Medical Liab. Mut. Ins. Co.*, 760 F.Supp. 1078, 1083 (S.D.N.Y.1991). Similarly, in cases involving binding preliminary agreements, the same importance should be placed on what the specific writing in question provides.

■ The first factor weighs heavily in favor of the plaintiff. The 1978 Letter provides: "This letter is not intended to be a complete agreement, but is to express the general intent of both parties and *is to govern in this matter until such an agreement is executed*" (emphasis added). This language indicates that the parties intended to create a more complete agreement in the future. Until such an agreement was created, however, the language clearly indicates that the 1978 Letter would govern. In contrast, contracts that were found not to be binding preliminary agreements contained provisions indicating that the contract was not intended to govern in the absence of a complete agreement. *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (drafts that provided "when executed and delivered, this [agreement] will be a valid and binding agreement" indicated no intent to be bound until the execution of a formal contract); *R.G. Group*, 751 F.2d at 76 (explicit wording of franchise agreement that declared "when duly executed" prevented a finding that parties intended to be bound prior to such execution).

The second factor, whether there has been partial performance of the contract, also weighs in favor of the plaintiff. Neither party disputes that Weinreich worked both before and after the execution of the 1978 Letter, nor that DSPI and SFC accepted these services and periodically advanced monies for them. *See R.G. Group*, 751 F.2d at 75 ("partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect").

The third factor weighs slightly in favor of the Defendants, since it is acknowledged that the parties had not reached an understanding as to "net profit". However, the existence of open terms does not per se defeat a finding of a contract. Indeed, "a court should find an agreement too indefinite only as a 'last resort' when it is 'satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear.'" *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir.1993) (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203, 206 (1989), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990)). The term net profit can easily be defined by reference to an extrinsic standard. *See*

Black's Law Dictionary 939 (5th ed. 1979) ("Net profits. Profits after deduction of all expenses"). *Cf. V'Soske*, 404 F.2d at 499 (finding the term "audited net worth" has a well defined meaning).

The fourth factor does not favor any party. The laser light show business at the time of the events in question was experimental and uncertain. No evidence was presented that arrangements between persons doing this work were customarily of an oral or written nature, or, if contracts were used, to what extent they were more complex than the 1978 Letter. Moreover, the importance of the third and fourth factors are also tempered by the fact that the 1978 Letter specifically provided that it would govern until a more complete agreement existed.

In sum, upon consideration of the four factors, a binding preliminary agreement was reached. This conclusion is especially warranted given the language of the 1978 Letter, which explicitly provided that the agreement would govern the parties relationship until a more formal agreement was executed.

## II. The Defendants are Jointly and Severally Liable under the 1978 Letter

■ Plaintiff seeks to hold the Defendants jointly and severally liable under the 1978 Letter. To do so, plaintiff urges the Court to pierce the corporate veil of defendant DSPI.[16] In New York, courts "disregard the corporate form reluctantly." *Gartner v. Snyder*, 607 F.2d 582, 596 (2d Cir.1979); *see also Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.*, 909 F.2d 698, 703 (2d Cir.1990). Between a corporation and its owners, "there is a presumption of separateness ... which is entitled to substantial weight." *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.) (citations omitted), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). The party seeking to pierce thus bears the burden of putting forward evidence that there is a basis to disregard the corporate form. *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), *aff'd*, 599 F.2d 34 (2d Cir. 1979).

■ To overcome the presumption of separateness and pierce the corporate veil, there must be a showing that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. Dep't of Taxation and Finance*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 810–11, 623 N.E.2d 1157, 1160–62 (1993). *Cf. Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) ("[l]iability ... may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993). The *Passalacqua* court set forth ten factors to consider in determining whether to pierce the corporate veil:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping corporate records and the like,

(2) inadequate capitalization,

(3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes,

(4) overlap in ownership, officers, directors, and personnel,

(5) common office space, address and telephone numbers of corporate entities,

(6) the amount of business discretion displayed by the allegedly dominated corporation,

(7) whether the related corporations deal with the dominated corporations at arms length,

(8) whether the corporations are treated as independent profit centers,

(9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and

(10) whether the corporation in question had property that was used by other of the

---

**16.** As found above, Sandhaus signed the 1978 Letter in his capacity as an officer of defendant DSPI. At the time of the signing, defendant SFC had not yet been incorporated.

corporations as if it were its own. 933 F.2d at 139.

Consideration of these factors is a fact specific inquiry that necessarily "differs with the circumstances of each case." *American Protein,* 844 F.2d at 60 (citing *FMC Fin. Corp. v. Murphree,* 632 F.2d 413, 422 (5th Cir.1980)).[17] Ultimately, "the general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *A/S Domino Mobler v. Braverman,* 669 F.Supp. 592, 594 (S.D.N.Y.1987) (citing *Brunswick Corp.,* 599 F.2d at 35). *See also William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600–01 (2d Cir. 1989); *Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 790 F.Supp. 428, 437 (S.D.N.Y.1992). *Cf. Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 985 (S.D.N.Y. 1992) (citations omitted) (existence of post-tort activity, "together with substantial ownership of stock of a corporation by one individual will support piercing the corporate veil for jurisdictional purposes on grounds of equity and fairness").

■ Piercing the corporate veil is appropriate in this case. The evidence demonstrates that Sandhaus was always in total control of both defendants DSPI and SFC. Moreover, if Weinreich could only pursue DSPI under this cause of action, he would essentially be denied any recovery because of Sandhaus' control of both entities. Consideration of the *Passalacqua* factors, including the stock holdings by Sandhaus and common office space, supports this holding. *See Carte Blanche (Singapore),* 2 F.3d at 28 (factors listed by court that pierced corporate veil included lack of separate offices and officer who was chairman of both corporate boards); *see also Passalacqua,* 933 F.2d at 140.

As noted above, Sandhaus was in sole control of both companies.[18] *See David v. Glemby Co.,* 717 F.Supp. 162, 167 (S.D.N.Y.1989) (in denying parent defendant's motion for summary judgment, court considers fact that those who controlled the defendant corporations referred to them as "our corporations"). Similarly, Sandhaus used DSPI stationery to write a letter on behalf of SFC. In *David,* 717 F.Supp. at 167, the court noted that the principals' use of the letterhead of one company on behalf of a second company suggested that they acted on behalf of both companies simultaneously. *See also Carte Blanche (Singapore),* 2 F.3d at 28. SFC's advertising literature also indicated that it was "an affiliate of DSPI."

The circumstances surrounding the purported sale of the Silver system from DSPI to SFC are also suspect, based upon the facts found above, and establish that the two entities did not deal with each other at arms length. Indeed, Defendants have not cited to a specific DSPI ledger entry—unlike their SFC ledger cite—to support their position that DSPI was compensated for the sale. Furthermore, Defendants do not cite to any ledger entries to support Sandhaus' testimony that DSPI was also credited for certain office and equipment rent as part of the transaction.

Finally, the Defendants admit that DSPI has been dormant for years, and thus presumably cannot satisfy a judgment in Weinreich's favor. It is thus inequitable for defendants Sandhaus and SFC to hide behind a corporate shield. "Carrying on a business without substantial capital and leaving the corporation without substantial assets to meets its debts can justify piercing the corporate veil." *Directors Guild of America, Inc. v. Garrision Productions, Inc.,* 733 F.Supp. 755, 762 (S.D.N.Y.1990). Indeed,

17. The alleged domination or fraud that forms the basis to pierce the corporate veil "must have occurred at the same time as the transaction that is complained of." *Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.,* 774 F.Supp. 840, 845 (S.D.N.Y.1991) (citing *Passalacqua,* 933 F.2d at 138). Nonetheless, the inquiry "examines the full spectrum of the relations" between the controlling party and the corporation. *Id.* To that end, the Court considers the timing of the transfer of the Silver system from DSPI to SFC to be a

factor in the piercing analysis. *Cf. Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 985 (S.D.N.Y.1992) (quoting *Minnesota Mining & Mrg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1264 (Fed.Cir.1985) (courts consider post-tort activities that "strip the corporation of its assets in anticipation of impending legal liability")).

18. *See supra* footnote 6 and accompanying text.

Sandhaus' business dealings with DSPI and SFC are similar to the facts in *Directors Guild*. There the court held the principal and a sibling corporation jointly and severally liable for the contracting corporation's judgment. A similar result is justified in this case. Accordingly, defendants Sandhaus and SFC are jointly and severally liable under the 1978 Letter.

### III. Weinreich's Work on the Silver System was Sufficient to Entitle Him to Recover under the 1978 Letter

■ Defendants contend that Weinreich's work on the Silver system was not competent, and thus he is not entitled to recovery under the 1978 Letter as a consequence of his failure to perform pursuant to the agreement. The same argument is used by the Defendants in seeking recovery under their counter-claims. A party to a contract can expect performance with "reasonable care and competence owed generally by practitioners in the particular trade or profession." *Milau Assoc., Inc. v. North Ave. Dev. Corp.*, 42 N.Y.2d 482, 398 N.Y.S.2d 882, 885, 368 N.E.2d 1247, 1250 (1977).

In 1978, the laser light show business was in its infancy. As Sandhaus testified, a year earlier he had evaluated approximately eight entities that were creating laser light show systems; he found none of them responsible, and thus worked with Metz and Weinreich to create their own system. Essentially, they were starting a new venture in uncharted territory.

The parties concede that there were several problems with the Silver system, such as the tilting mechanism and the silver housing. Indeed, the system was not used by its intended client, Foreigner. Nonetheless, the Silver system was used at various venues, including the Xenon disco and the Waldorf–Astoria. More importantly, Sandhaus continued to work with Weinreich for more than a year after Foreigner rejected the Silver system. It is simply not credible that Sandhaus would continue to work with someone for another year after determining that his services were incompetent. Accordingly, Weinreich's performance in connection with the Silver system was reasonable, given the state of the laser light show business at that time. For the same reasons, Defendants' counter-claims are dismissed.

### IV. The 2000 System is Similar or Derivative of the Silver System: the 360 System is Not

The 1978 Letter provided that Weinreich would be entitled to one-third the net profits of all products that are similar to or derivative of the Silver system. Not surprisingly, the parties disagree as to the meaning of the phrase "similar or derivative." Weinreich urges a broad interpretation while the Defendants maintain that a narrow reading is appropriate.

■ In construing contractual provisions, courts must initially determine if the language is ambiguous. Language in a contract is "ambiguous if it is reasonably susceptible of more than one interpretation." *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990). Moreover, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (citations omitted). Reference to an extrinsic standard that makes the meaning clear is appropriate. *See Mar Oil*, 982 F.2d at 840. Neither the terms "similar" nor "derivative" are ambiguous in this context. Both terms are readily defined by reference to a standard dictionary. Webster's Ninth New Collegiate Dictionary 342, 1098 (1985) defines similar as: "1: having characteristics in common ... 2: alike in substance or essentials." Derivative is defined as: "1: formed by derivation 2: made up of or marked by derived elements."

Both the 2000 system and the Empire State Building system are similar to and derivative of the Silver system. The 360 system and all other systems developed after 1982 are not.

Both the Silver system and the 2000 system are substantially similar: the basic design function and the optical path geometry of the two systems were the same, and they both have nearly identical components, ex-

cept to the extent that the 2000 has certain improved features. Significantly, the functioning of the galvanometers—which direct the laser beams—are nearly identical in both systems. The Empire State Building system was also similar to the Silver system. In fact, the evidence indicates that the Empire State Building system was simply a modified 2000.

■ In contrast, the 360 system was a significant departure from the Silver and 2000 systems. Unlike the prior laser light show systems developed by DSPI and SFC, the 360 could project a figure over 360 degrees without an image rotation problem. This was a significant development that was due to an entirely new assembly for the galvanometers. As O'Brien stated:

> Unlike the [Silver or 2000 systems], which use one or several parallel pairs of fixed galvos for simultaneous projection from a stationary projector box, the new 360 series uses only one pair of galvos mounted in an elaborately articulated assembly. The galvos rotate in tilt motion as a pair together on a subassembly. In addition, this entire subassembly, rotates 360 degrees on the pan axis, hence the name 360 series. Ex. AF, at ¶ 12.

As such, the 360 was not similar since the galvanometer characteristic between this system and the prior systems were not at all in common. Moreover, the 360 was not derivative since the galvanometer assembly, which is a significant element of these systems, was entirely new.

## V. Damages for Breach of the 1978 Letter

■ Pursuant to the 1978 Letter, Weinreich is entitled to one-third the net profits of the Silver and 2000 systems. Certain calculations are not in dispute. For the Silver system, the profits are a negative $20,289.20. The parties, however, strenuously contest the calculation of the net profits for the 2000 series.[19] Plaintiff bears the burden of proving damages. *Manshul Constr. Corp. v. Dormitory Authority*, 79 A.D.2d 383, 386, 436 N.Y.S.2d 724, 728 (1st Dep't 1981).

According to the Defendants' calculations for the 1978 to 1981 period, total income for the 2000 system was $1,664,818.28, and total costs were $1,734,216.56, leaving a negative balance of $69,398.28. As set forth above, costs should be deducted by $160,050.02, leaving a total cost of $1,574,166.54, and income should be increased by $3,410.00, for a total income of $1,668,228.28.[20] Consequent-

---

**19.** Weinreich contends that the Court should draw an adverse inference against the Defendants because Sandhaus failed to retain—during his office's 1981 move—backup documentation to support DSPI and SFC ledger entries. To draw an adverse inference against a spoliator, courts must initially determine if there was a duty to preserve evidence. If such a duty existed, courts then consider both the intent of the spoliator as well as the contents of the destroyed evidence.

Presuming Sandhaus had a duty to preserve, the destruction of the documentation was not intentional, i.e. it was not "intended to prevent the use of this evidence in litigation." *Turner v. Transit Lines, Inc.*, 142 F.R.D. 68, 74 (S.D.N.Y. 1991) (Magistrate Judge Francis), *aff'd*, 1992 WL 58858, 1992 U.S.Dist.Lexis 2827 (S.D.N.Y. Mar. 19, 1992). Nonetheless, certain circuits have held that the negligence of the spoliator can suffice to draw an adverse inference. *See Pressey v. Patterson*, 898 F.2d 1018, 1024 (5th Cir.1990); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993). The Second Circuit, however, has declined to do so. *See Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir.1991); *see also Britt v. Block*, 636 F.Supp. 596, 606–07 (D.Vt.) (negligent destruction of evidence is insufficient to change the burden of proof), *aff'd mem.*, 805

F.2d 390 (2d Cir.1986). *Cf. Skeete v. McKinsey & Co.*, 1993 WL 256659, at * 16, 1993 U.S.Dist.Lexis 9099, at *21 (S.D.N.Y. July 7, 1993) (dicta); *Turner*, 142 F.R.D. at 75–76 (dicta).

Even if an adverse inference could be drawn for the negligent destruction of evidence, the contents of the destroyed documents in this case would not support such an inference. In cases involving negligent destruction, "it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Turner*, 142 F.R.D. at 77 (citing *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 924 n. 7 (2d Cir.1981)). Accordingly, "special caution must be exercised to ensure that the inference is commensurate with information that was reasonably likely to have been contained in the destroyed evidence." *Id.* In the instant case, no evidence was presented to indicate that the backup documentation would not have supported the ledger entries. Consequently, an adverse inference will not be drawn against the Defendants for failing to retain this documentation.

**20.** Weinreich failed to meet his burden of proof as to certain items that he sought to include as income and costs for this period. *See supra* footnotes 10 and 11.

ly, the net profits of the 2000 system were $94,061.74. From this amount should be deducted the negative balance from the Silver system of $20,289.20, for a total net profit of $73,772.54. Weinreich is entitled to one-third this amount, $24,590.85, minus the draw on profits he previously received. Weinreich was advanced $14,875.00, of which $10,700.00 should be deducted for work on the Kiss project. The total draw is thus $4,175.00, and the total amount that Weinreich is entitled to is $20,415.85 for the 1978 to 1981 period.

Weinreich also seeks damages for the use of the 2000 system after 1981. Based on the Court's finding above, Weinreich is entitled to one-third the sum of the following: $82,875.00 for income received by SFC for the first five months of 1982; $25,625.00, which represents one-sixteenth of the income received from the Knoxville Worlds Fair show;[21] $13,750.00, which—for the same reasons as the indoor show at Knoxville—represents one-fourth of the amount received for the show in Sao Paulo, Brazil; $5,334.88, for an earlier 2000 sale to Palace Management; and $7,500.00, which represents one-half of the revenue generated by the New York Harbor show in July 1982. The total income for all these projects is $135,084.88. For post–1981 uses of the 2000 system, seventy-five percent of the total income equals the net profit, according to the Sandhaus allocation referred to in footnote 13 above. The net profit is thus $101,313.66. One-third of this total is $33,771.22.

Weinreich's total damages under the breach of contract cause of action are $54,187.07. Pursuant to N.Y.Civ.Prac.L. & R. § 5001(a) & (b) (McKinney 1992) ("CPLR"), Weinreich is entitled to interest on the breach of contract damages. The interest rate is six percent for pre-June 25, 1981 damages, and nine percent thereafter. CPLR § 5004. The interest is to be computed when the damages were incurred, "or upon all of the damages from a single reasonable date." CPLR § 5001(b). For the 1978

to 1981 period, an appropriate date for the interest to begin to be computed is June 30, 1980. For the 1982 and 1983 period, the interest should begin to be computed on June 30, 1982.

## VI. *The Quantum Meruit Cause of Action*

■ Plaintiff Weinreich also seeks recovery under *quantum meruit* from the Defendants for work performed on projects other than the Silver system. In connection with the 2000 system, Weinreich contends—without citing to any authority—that he is entitled to *quantum meruit* for the work he did on this system, even though he is receiving one-third of the net profits under the 1978 Letter. It is well settled that recovery in *quantum meruit* is unavailable where an express contract covers the subject matter. *Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988). The 1978 Letter does not address Weinreich's work on systems subsequent to the Silver system. However, courts can imply terms in a contract, either in fact or in law:

"Implied terms have been divided into three categories: (1) terms that the parties intended, (2) terms that the parties would have intended had they thought about it and (3) terms that are fair. The first involves a search for the parties' intention, the second involves a search for the parties' hypothetical intention, the third has nothing to do with the parties' intention, except that the court will generally not imply a term in the face of the parties' expressed intent to the contrary.... "Implied in law" or "constructive" terms ... include the second and third categories. *Yonkers*, 844 F.2d at 46 (quoting Hadjlyannakis, *The Parol Evidence Rule and Implied Terms: The Sounds of Silence*, 54 Fordham L.Rev. 35, 38 n. 22 (1985)).

■ At trial, neither party proffered evidence concerning the first category of implied terms. Consequently, the Court considers whether a provision concerning the

---

**21.** This amount is calculated as follows: only one of the four laser systems, the indoor show, used a 2000–derivative system. Thus, only one-fourth of the show's income should be credited to this indoor show. And only one-fourth of this indoor

system was derived from a 2000 system. Accordingly, one-sixteenth of $410,000.00 should be considered derivative income from a 2000 system.

2000 system is implied in law under either the second or third category for the 1978 Letter. During 1978 and 1979 the parties—and especially Weinreich [22]—acted as joint venturers. Although this collaboration never came to fruition, had "they thought about it," 844 F.2d at 46, the parties would have provided that Weinreich was entitled to one-third of the net profits from the 2000 system as well. More importantly, in any event the parties would not have provided that Weinreich was entitled to one-third of the profits *and* an hourly wage for work performed in connection with the 2000 system. For the same reasons, such a provision is fair as well. Accordingly, Weinreich may not recover an amount in *quantum meruit* for the work he did on the 2000 system.

■ He may, however, seek *quantum meruit* for work done on other projects. To recover in *quantum meruit*, a party "must establish performance of his services in good faith, acceptance of the services by persons to whom such services were rendered, expectation of compensation, and the reasonable value of such services." *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 773 F.Supp. 632, 640–41 (S.D.N.Y.1991) (citing *Martin H. Bauman Assocs. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 567 N.Y.S.2d 404 (1st Dep't 1991)). Plaintiff bears the burden of proof in *quantum meruit* actions. *Miller v. Maryland Casualty Co.*, 114 Misc.2d 713, 452 N.Y.S.2d 309, 311 (N.Y.Civ.Ct.1982).

■ Based on the evidence presented, Weinreich has met the first three prongs of the *quantum meruit* test. Weinreich performed services for the Defendants at various times from April 1978 to September 1979. During this time, it is not disputed that Weinreich worked on various projects for the Defendants. These services were accepted by the Defendants and despite the present complaints about the quality of these services, and despite the failure of the Silver system, Sandhaus again worked with Weinreich on the 2000 system and the Kiss project, thus recognizing in fact the experimental nature of the work being performed.

The third prong of the *quantum meruit* test has also been met. Throughout their collaboration, Weinreich believed that he, Sandhaus and Metz would be joint venturers. Ultimately, this venture never materialized. It is reasonable to conclude that Weinreich would nonetheless expect to be compensated. Indeed, it is inconceivable that Weinreich would have worked for the Defendants at various times over eighteen months for free.[23]

Weinreich's difficulty in recovering under *quantum meruit* is the fourth prong, a reasonable value for the services rendered. Specifically, the evidence presented does not support Weinreich's contention that he should be compensated at $60.00 an hour for work allegedly performed for the Defendants for forty hours a week for 78 weeks. To begin with, the work Weinreich did on the 2000 system is covered by the 1978 Letter and thus recovery under *quantum meruit* is not appropriate. The primary evidence presented in support of Weinreich's contention that he worked full time for 78 weeks is his own testimony, which was not credible on this issue.[24] Weinreich neither kept time records nor ever billed the Defendants for work he allegedly performed. Moreover, Weinreich was unable to specify how much time he spent on any particular project on any particular day. In contrast, in *Paolangeli v. Thaler*, 187 A.D.2d 881, 882, 590 N.Y.S.2d 316, 317 (3rd Dep't 1992), the court

---

**22.** For instance, Weinreich considered payments in connection with the 2000 system to be draws on profits.

**23.** Defendants' reliance on *Reisner v. Recco Temporary Services, Inc.*, 136 A.D.2d 686, 524 N.Y.S.2d 102 (2d Dep't 1988) and *Mance v. Mance*, 128 A.D.2d 448, 513 N.Y.S.2d 141 (1st Dep't 1987) is misplaced. In *Reisner*, the plaintiff had expressly indicated that he would work a certain period without a salary. In contrast, in this case the evidence does not support a finding that if the parties' venture did not materialize, that Weinreich would not expect to be compensated for the work he had done. In *Mance*, unlike this case, the plaintiff had received a salary and fringe benefits.

**24.** *See supra* note 14 and accompanying text. Moreover, the testimony of Metz and Schultz, taken together with Weinreich's, is insufficient to meet plaintiff's burden in *quantum meruit*.

dismissed defendant's contention that there had been a failure to prove reasonable value of service when the plaintiff proffered detailed daily records of his work.[25] Accordingly, Weinreich has not carried his burden to prove that he worked full time for eighteen months.

However, as detailed below, there were specific projects that Weinreich worked on during this eighteen month period in which the evidence supports a *quantum meruit* recovery. For these projects, a reasonable per hour rate is $25.00. This amount is based on contemporaneous work that Weinreich performed for the Defendants. For instance, Weinreich was paid $250.00 to work for the Defendants on a Bulova project for one day. Similarly, the evidence shows—and Weinreich does not dispute—that he worked for approximately three months on the Kiss project, for which he was paid $10,700.00. These two projects indicate that Weinreich was paid approximately $25.00 per hour for the work he did for the Defendants.

There are certain projects for which Weinreich has already been paid, and thus is not entitled to any further compensation. These projects are: the Foreigner centerfold, for which he was paid $500.00; the Bulova project, for which he was paid $250.00; and the Washington Hilton project, for which he was paid $250.00. In addition, Weinreich was paid $10,700.00 for the Kiss project.

The evidence does support the conclusion that Weinreich be compensated for specific projects that he worked on. In May 1978, Weinreich worked on the Laser Tinker Bell project. The evidence indicates that the project was designed and fabricated very quickly, and that Weinreich delivered it to the client in Philadelphia. Appropriate payment for this project is $400.00, representing two days work. In January 1979, Weinreich worked "a little bit" with Metz on a laser video report. An appropriate payment for

this project is $100.00, representing a half day of work. At about the same time, Weinreich worked on a trade show booth and brochure, and also attended one of the trade shows. Except for testimony about attendance at the trade show, no evidence was introduced concerning the amount of time spent on these projects. An appropriate payment would be $1000.00, representing five days work.

Weinreich also seeks *quantum meruit* recovery for three separate projects concerning certain laser effects: a color chopper, a beam stealer and a laser chaser. Recovery is not appropriate for the work done on these projects since they were all intended to be components of the 2000 system.

In sum, Weinreich is entitled to $1,500.00 in *quantum meruit*. Weinreich is also entitled to interest on the *quantum meruit* damages. *See Govern & McDowell v. McDowell & Walker, Inc.*, 75 A.D.2d 979, 428 N.Y.S.2d 367, 368 (3rd Dep't 1980). The interest rate is six percent for pre-June 25, 1981 damages, and nine percent thereafter. CPLR § 5004. The interest is to be computed when the damages were incurred, "or upon all of the damages from a single reasonable date." CPLR § 5001(b). An appropriate time for this interest to begin to be computed is June 30, 1979.

### Conclusion

Judgment against the Defendants will be entered awarding Weinreich the sum of $55,687.07, and interest on that amount as set forth above. Settle judgment on notice.

It is so ordered.

---

**25.** Weinreich's reliance on *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir.1993), is misplaced. More disturbing, counsel's description of the holding in *Mar Oil* is misleading. There the court specifically held that the defendant attorney was *not* entitled to $200.00 per hour for 1200 hours because, in part, he had kept no time records. *Id.* at 840–43. What the Second Circuit did indicate—and which is applicable to the instant case—is that on remand the trial court should determine the number of hours the defendant attorney worked "with doubts resolved against [him] since he failed to keep time records." *Id.* at 843.