937 F.2d 603
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PHOENIX MUTUAL LIFE INSURANCE COMPANY, Plaintiff-Appellant,
v.
SHADY GROVE PLAZA LIMITED PARTNERSHIP, Property Company of
America, Michael B. Windsor, Ron Beneke, Hugh
Caraway, Paul D. Hinch Family
Partnership, Ltd., Ray F.
Biery, Defendants-Appellees.
 No. 90-1037.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 10, 1991.
Decided July 12, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Alexander Harvey, II, Senior District Judge. (CA-89-963-H)
 Nell Berelson Strachan, Venable, Baetjer and Howard, Baltimore, Md. (Argued), for appellant; Mitchell Y. Mirviss, Baltimore, Md., on brief.
 Robert X. Perry, Jr., Wilkes, Artis, Hedrick & Lane, Chartered, Washington, D.C. (Argued), for appellees: J. Carter McKaig, Wilkes, Artis, Hedrick & Lane, Chartered, Washington, D.C., on brief.
 D.Md., 734 F.Supp. 1181.
 AFFIRMED.
 Before PHILLIPS and NIEMEYER, Circuit Judges, BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 When their negotiations looking to the formation of a general partnership for a real estate venture broke down, Phoenix Mutual Life Insurance Company, a proposed investor, sued its proposed partners, Shady Grove Plaza Limited Partnership and Property Company of America, interrelated real estate development entities and their partners and principals, on a number of claims. The district court granted summary judgment to the defendant-developers on all the claims and we affirm.
 
 
 2
 * Phoenix Mutual Life Insurance Company (Phoenix Mutual) is a major life insurance company and investor in commercial and multi-unit residential real estate. Property Company of America (PCA) is a Tulsa, Oklahoma based national developer of commercial real estate. PCA serves as a "packager" of deals: it does not directly participate as PCA in real estate projects, but instead a number of PCA principals, along with other investors, form partnerships to finance specific deals.
 
 
 3
 PCA and Phoenix Mutual had worked together in the past on a number of apartment buildings and to-be-built office buildings. Under their developed pattern, PCA and its principals would design, develop, and build the project, with their own or borrowed money. Once the building was complete, Phoenix Mutual would enter the partnership by purchasing a one-half interest at a pre-determined figure. The advantage of this "tail end" financing was that the developer gained access to front-end financing from banks while the institutional investor benefitted because it did not bear the risk of cost overruns, since the "purchase" price of the partnership interest was established before construction began.
 
 
 4
 The Shady Grove Plaza office building project followed this script, almost. As a consequence of their having worked together before, PCA, through a mortgage broker, L.J. Melody Company, approached Phoenix Mutual in late 1986 with the idea of developing an office complex, the $23 million Shady Grove Plaza, in Rockville, Maryland. Phoenix Mutual, after some study, decided that it was an idea worth pursuing. Principals of PCA then formed the Shady Grove Limited Partnership, a Maryland limited partnership (Shady Grove), which purchased land for the office building in early 1987, using funds provided by Citicorp Real Estate, Inc., N.A. (Citicorp). Citicorp had tentatively agreed to provide $23 million in financing for the entire project, provided that Shady Grove Partnership found an equity investor. Shortly after Shady Grove Partnership purchased the land, negotiations began with Phoenix Mutual on the elements of a letter of intent.
 
 
 5
 It had been the custom of Phoenix Mutual and PCA first to negotiate "deal points" in a letter of intent in order to establish the main terms and conditions on which Phoenix Mutual would be willing to proceed. After they had negotiated the letter of intent and signed it, they would then negotiate a partnership agreement.
 
 
 6
 The parties began to discuss the key features of the deal in issue in spring 1987. In June 1987, Phoenix Mutual's investment policy committee initially approved the project and authorized Phoenix Mutual to go ahead with negotiations for a letter of intent. Phoenix Mutual drafted a letter dated June 12, 1987 containing the "business points" purportedly agreed to by the parties. Shady Grove responded by objecting to some of the points and suggesting others. The parties continued to negotiate, and a second letter was drafted by Phoenix Mutual in October 1987 which incorporated by reference the first letter and also added new terms. The second draft did not result in agreement, so the parties agreed to put off further negotiations until PCA and Phoenix Mutual completed negotiations on another project they were working on, the Antioch Plaza. The parties decided to hold off on the Shady Grove project and let the terms negotiated for Antioch Plaza serve as a "model" for the unresolved items.
 
 
 7
 The parties reached agreement on Antioch Plaza in December 1987. Shortly thereafter, PCA requested Phoenix Mutual to include several items from the Antioch Plaza agreement in the Shady Grove letter of intent. Phoenix Mutual included some, but not all of the items requested by Shady Grove in a third letter of intent, dated January 8, 1988. (This letter incorporated by reference the two prior letters to the extent they had not been amended and the three are therefore referred to collectively as the "letter of intent.") Two items negotiated in the Antioch Plaza agreement were not included but were left to be "negotiated to mutual satisfaction" in the partnership agreement. A few weeks later the parties signed the January 8, 1988, letter of intent.
 
 
 8
 The letter of intent signed by the parties contains several terms which are the focus of this dispute. For one, the letter provided that after execution, Phoenix Mutual "proposes to enter into a Maryland general partnership with you ... if we can negotiate a mutually acceptable general partnership agreement which accommodates [a list of "deal points" whose statement covered ten single-spaced pages]." Second, it provided that upon execution of the partnership agreement Phoenix Mutual would purchase from Citicorp a "jumbo" certificate of deposit (CD) in the amount of $11.5 million. In return for Phoenix Mutual's jumbo CD, Citicorp would give Phoenix Mutual a bonus rate; Shady Grove would in turn benefit because it would know that the funds were committed and available for investment in the project at or around the time of maturity. Third, the letter provided that Shady Grove was responsible for constructing the office building within the projected budget, and that any cost overruns would not be borne by the to-be-formed general partnership. Fourth, the letter stipulated in two places that if the parties were not able to reach accord on a partnership agreement, then Shady Grove must reimburse Phoenix Mutual for all legal fees. The letter concluded by providing, "If you are willing to proceed in good faith to attempt to negotiate a mutually acceptable partnership agreement, please [sign below]." And a final sentence added that "[e]xecution of this letter shall not obligate [the parties] to accept any particular terms for such partnership agreement beyond those provided for herein," and that "the partnership agreement must be mutually satisfactory" to both sides.
 
 
 9
 After the letter of intent was signed, Shady Grove sent it to Citicorp, pursuant to the bank's request for evidence of an equity investor that was interested in the project. Citicorp then released to the developers the balance of the $23 million construction loan. Having this money in hand, Shady Grove began development and construction of the office building.
 
 
 10
 Around this same time, negotiations began between Phoenix Mutual and Shady Grove on the partnership agreement. Before the parties had made any progress, however, both wanted to reopen issues that presumably were settled in the letter of intent. In February 1988, shortly after the letter was signed, Phoenix Mutual notified Shady Grove that it wanted to avoid having to purchase the jumbo CD from Citicorp, because it did not want to tie up the funds. The developers agreed to this, conditioned upon a lost-interest adjustment. Around this same time, PCA was encountering significant cost overruns, but did not bring these to the attention of Phoenix Mutual. Instead, it waited until Phoenix Mutual had sent a draft of the proposed partnership agreement, sometime in May 1988. At that time, PCA let Phoenix Mutual know that it wanted to increase the total cost of the project, in order to shift some of the overrun costs onto Phoenix Mutual's side of the ledger. Phoenix Mutual refused, and the parties spent several months trying to resolve the issue, but stalemated.
 
 
 11
 To attempt resolution of the stalemate, principals from PCA and Shady Grove met with the investment officers of Phoenix Mutual at their headquarters in Hartford, Connecticut. This meeting only lasted a short time, and accounts of the meeting differ widely. Phoenix Mutual later claimed that PCA officials never had any intent to negotiate seriously on the outstanding issues; PCA officials, that Phoenix Mutual's officers were rude and insulting and not hospitable to any discussion. In any event, after that meeting ended in failure, the parties completely broke off negotiations and no partnership agreement was ever executed.
 
 II
 
 12
 Phoenix Mutual then brought this diversity action against Shady Grove, PCA, and their individual principals and partners, alleging a number of closely related claims: breach of contract; breach of a good faith duty to negotiate a contract; breach of a fiduciary duty; promissory estoppel; misrepresentation and negligence. Various forms of relief were sought: a declaratory judgment that Phoenix Mutual had become a partner by virtue of the formation of a contract to that effect and therefore was entitled to share in the joint venture proposed in the letter of intent; an accounting for partnership profits; specific performance in the form of execution of the proposed partnership agreement; a judicial sale of the real property for partition; and money damages.
 
 
 13
 In gist, the claims came to this: that the parties' negotiations had ripened into an express contract, memorialized in the letter of intent that was then breached by the defendants' failure to execute the proffered partnership agreement; that alternatively, the negotiations had imposed upon the parties a good faith duty to bargain through to contract, which duty the defendants had breached; that, alternatively, the defendants by their negotiating and related conduct had induced detrimental reliance by Phoenix Mutual which estopped them from denying the existence of a partnership; that, alternatively, the parties' "special relationship" had imposed upon the defendants a fiduciary duty which they had breached by their refusal to recognize Phoenix Mutual's partnership; and, that the defendants' conduct constituted fraudulent misrepresentations and a negligent breach of general tort duty entitling Phoenix Mutual to monetary relief.
 
 
 14
 Following extensive discovery and the development of a voluminous record, the district court entertained the defendants' motion for summary judgment. Based upon the summary judgment materials of record and written memoranda and oral argument of the parties, the court granted summary judgment to the defendants as to all claims in a published opinion. Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership, 734 F.Supp. 1181 (D.Md.1990).
 
 
 15
 In a prologue to its detailed analysis of the summary judgment record and each of Phoenix Mutual's claims, the court cogently summarized its ultimate conclusion that as a matter of law on the material facts not in genuine dispute on that record, Phoenix Mutual was not entitled to recover on any of the claims.
 
 
 16
 Naturally disappointed that the lengthy negotiations went for naught and that no partnership agreement was ever consummated, plaintiff in this litigation has sought to create a contract where none existed and has struggled to come up with some theory whereby defendants might be adjudged guilty of some type of wrongful conduct. Counsel for plaintiff argues that the crux of this case is an issue of fundamental fairness. If that is the standard to be applied, plaintiff assuredly is not entitled to proceed to trial. It was hardly unfair under the circumstances here for defendants to discontinue negotiations and decline to enter into a partnership agreement with plaintiff. The parties had agreed in writing that there would be no deal at all unless a mutually acceptable partnership agreement was executed. When plaintiff refused to accept terms of the agreement proposed by defendants, no mutually acceptable contract was possible. Defendants acted fairly and reasonably when they decided that their economic interest would best be served by terminating the discussions. Defendants did not, as plaintiff has argued, go too far down the road to call off the deal with impunity, since defendants had the right to call off the deal at any time before a formal agreement was executed.
 
 
 17
 On the very full record here, this Court concludes as a matter of law that no agreement was ever reached between the parties and that none of the wrongs alleged were committed by defendants.
 
 
 18
 Id. at 1186.
 
 
 19
 In a detailed and accurate factual and legal analysis, the court, properly applying current summary judgment standards, then demonstrated as to each claim why summary judgment was warranted. Reviewing the record de novo, see Smith v. University of North Carolina, 632 F.2d 316, 338 (4th Cir.1980), and after full consideration of the written briefs and oral arguments of the parties, we find ourselves in full agreement with the district court's analysis. Phoenix Mutual as appellant has essentially repeated in this court the arguments made to, considered by, and rejected by the district court. It has not persuaded us of any fundamental flaw or oversight in the district court's analysis of the summary judgment evidentiary materials, nor of any misapprehension or misapplication of controlling legal doctrine by that court.
 
 
 20
 Under the circumstances, we see no need to repeat and elaborate upon the district court's reasoning as reflected in its published opinion. Accordingly, we adopt that opinion as our own and on its basis affirm the judgment for defendants-appellees.
 
 
 21
 AFFIRMED.