Peter SHANN, Plaintiff,

v.

John S. DUNK, Defendant.

John S. DUNK, Plaintiff,

v.

Peter C. SHANN, Defendant.

Nos. 93–CV–256, 93–CV–360.

United States District Court,
N.D. New York.

Nov. 25, 1994.

McLaughlin & Stern, Alkalay Handler Robbins & Herman (Peter S. Herman, of counsel), New York City, for Shann.

Hiscock & Barclay (James H. McGowan III, of counsel), Syracuse, NY, for Dunk.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

The instant action arises out of two cases which have been consolidated. John Dunk originally filed his complaint against Peter Shann in state court, and soon thereafter, Peter Shann filed his complaint against John Dunk in federal court and removed the state court proceeding. For convenience sake, the court will refer to Mr. Shann as the plaintiff and Mr. Dunk as the defendant. In doing so, the court intends no favoritism or prejudice to either party.

A bench trial was held August 1–5, 1994 on the issue of liability. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

This is an action for specific performance of an alleged written agreement between plaintiff and defendant. Plaintiff alleges that on November 25, 1992, he and the defendant entered into a four page, handwritten agreement in which defendant agreed to sell, and plaintiff agreed to purchase, defendant's 242 shares in St. Lawrence Explosives Corpora-

tion. The plaintiff and the defendant further agreed in this written document that defendant would acquire the 60 shares of SLE stock owned by his daughter, Deborah Netto (hereinafter "Netto"), and sell them to the plaintiff. The plaintiff alleges that on or about November 25, 1992, Netto initialed the paragraph in the agreement which sets forth the obligation to include her shares in the agreement between the plaintiff and the defendant. Netto was not a signatory to the whole agreement.

Before we delve into the specifics surrounding the alleged agreement of November 25, 1992, some background information should be laid. Plaintiff is a citizen and resident of York, England. He is the owner of Explosives Developments Ltd. and affiliates, which are engaged in the development, manufacture and sale of commercial explosives, primarily to mines and quarries, in the United Kingdom. Explosives Developments Ltd.'s market share for commercial explosives in the U.K. amount to approximately one-third.

Defendant is the controlling shareholder of St. Lawrence Explosives Corp. (hereinafter "SLE"). SLE is a New York corporation with its principal place of business in Adams Center, New York. SLE manufactures low grade explosives, provides drilling and blasting services, and sells and resells explosive products. SLE has 333 shares of outstanding stock and ownership of these stocks are broken down as follows: Defendant, as majority shareholder, owns 242 shares which amounts to 73% of all outstanding shares; defendant's daughter Netto owns 60 shares; defendant's son Erik Dunk (hereinafter "Erik") owns 27 shares; and SLE's President, Julie Pecori (hereinafter "Pecori"), owns 4 shares.

The facts during trial revealed that defendant has, for a long time, been actively attempting to sell SLE. There appear to have been a number of prospective buyers including plaintiff. The most recent offer, excepting the offer made by the plaintiff which is the subject of the present litigation, was an offer made by Boyes, Inc., a Canadian explosives company. Apparently, a lot of work was invested by both parties into the pro-posed buy-out, but the deal fell through just prior to closing. As for plaintiff and defendant's relationship, they have had a long history of proposed joint ventures which never reached fruition; plaintiff has attempted to purchase SLE on two prior occasions without any success.

In the fall of 1992, Erik contacted plaintiff and his personal solicitor, Reginald Ashworth, to inquire whether plaintiff was still interested in acquiring SLE. At this time, plaintiff, who was disheartened by two prior failures when dealing with defendant, insisted that defendant sign an option contract prior to any further negotiations. Plaintiff did not want to travel to the United States unless plaintiff bound himself to certain terms under the option contract. Proposed option contracts were exchanged by both parties. On or about November 6, 1992, defendant sent a handwritten proposed option contract which · was acceptable and signed by both parties.

At this point in time, plaintiff and Ashworth made the trans-Atlantic journey to the United States to meet with defendant and to arrange financing for the transaction. They met in Watertown, New York. The terms of the option agreement need not be discussed here because the agreement never materialized due to plaintiff's failure to obtain the required amount of financing for the transaction. The primary factor in the failure to obtain the required financing was plaintiff's insistence that no personal guarantees would be given by him. Soon thereafter plaintiff left Watertown and only Ashworth remained.

On or about November 25, 1992, defendant and Ashworth met at the Ramada Inn to discuss a new proposal for the sale of SLE. After a breakfast meeting, Ashworth retreated to his room to draft an agreement stating the terms discussed by them during their earlier meeting. By early afternoon, Ashworth had drawn up a proposed agreement laying out the terms for the sale of SLE (hereinafter "the 11/25 agreement"). Initially, the agreement provides that "Seller agrees to sell and Buyer agrees to buy seller's shareholding comprising 242 shares" of SLE, and moreover, defendant is to "procure" Netto's shares to sell to plaintiff. As

for the sale price, plaintiff is to pay defendant a $50,000 cash deposit and $450,000 upon closing which is to occur no later than January 31, 1993. Netto is to be paid $360,000 plus interest for her shares. In addition to the sale price, the agreement goes on to say that defendant is to be paid an amount of $2,352,000 plus interest at the rate of 7% over prime in 60 monthly installments commencing one month after closing as compensation for the non-competition and consultation clause. The interest is to have a floor of 10% and a ceiling of 15%. This interest rate is to apply to Netto's purchase price as well. The writing also contemplates the future preparation of a stock purchase agreement.[1]

1. The agreement in its totality states:

This agreement is made the 25th day of November 1992 between John S. Dunk (Seller) and Peter Shann (Buyer)
WHEREBY:
1) Seller agrees to sell and Buyer agrees to buy Seller's shareholding comprising 242 shares in St. Lawrence Explosives Corporation in the terms set out below.
2) Seller further agrees to promise that his daughter Deborah Netto will sell her shareholding comprising 60 shares and buyer agrees to buy that shareholding in the terms set out below.
3) A deposit of 50,000 U.S.D. shall be paid to the bank account of the seller within 14 days of this agreement.
4) The sum of 450,000 U.S.D. shall be paid by the buyer to the seller at closing and if closing does not take place by 31 January 1993 the seller shall be free to sell to others and the deposit shall be forfeited unless in either case there is default by the seller. The parties will use their best endeavors to effect closing before that date.
5) In addition seller shall be paid as consultant and pursuant to a non-compete agreement the following sums:
a) the sum of 2,352,000 U.S.D.
b) a sum equivalent to interest calculated monthly in the amount from time to time outstanding at the rate of prime plus 7% subject to a minimum rate of 10% and a maximum rate of 15% such parameters being subject to review by the parties if prime at any time exceeds 8% or falls below 3% and in the event of disagreement settled by the company's Accountant.
By 60 monthly payments equivalent to payments of principal and interest the first payment to be made one month after closing.
6) In addition Deborah will be paid the following sums by the company:
a) the sum of 360,000 U.S.D. 60 months after closing or earlier by agreement.

On or about December 2, 1992, plaintiff wired to defendant's bank account the $50,000 deposit as required under the 11/25 agreement. In December of 1992, during correspondence between the attorneys for the parties involved—William Kissel, Esq. for the defendant and Hartley Chazen, Esq. for the plaintiff—it was revealed that plaintiff was in the process of forming a corporation to be the record owner of defendant's SLE shares after closing.

From the testimony of the witnesses, it seems clear that defendant was very nervous of the fact that the 11/25 agreement did not call for the personal guarantee of plaintiff.

b) a monthly sum equivalent to interest calculated in accordance with clause 5(b) the first payment to be made one month after closing.
7) For five years after closing seller shall continue to represent the company on the Board of Governors of the I.M.E. and attend the Annual Conference of the S.E.E. at company expense as in the past.
8) For the same period seller shall be included in the Company Health Insurance Plan so long as he meets the requirements of the Insurance Company and he will continue to have the use of the company car as in the past at company expense and when mutuals agrees shall be provided with a new company car of equal quality style etc. as in the past, which car will become the property of the seller no later than 60 months after closing.
9) Seller will afford all reasonable information data and assurances which Buyer may request relative to the business of the company and in the event of disagreement as to the reasonableness of any such request the company's accountant shall settle it.
10) Buyer will present to Seller a purchase agreement basically including the above terms and conditions and the assurances etc. referred to in (9) within 30 days hereof and also including a pledge of all shares acquired to seller as security to the seller for fulfillment of the agreement such pledge to contain *provisions* requiring the buyer to give monthly reports of the financial affairs of the Company.
11) Modifications and improvements including technology which affect the operation of the Company introduced by the buyer shall remain for the utility of the company until all sums due have been paid.
12) The parties agree that they will do all such further acts and things necessary to give full effect to this Agreement.
13) New York state law prevails.
14) This agreement shall be completed by the parties faxing a signed copy of it to each other.
Signed by John Dunk
Signed by Peter Shann

On or about December 22, 1992, defendant held a closed meeting where discussions were had on the issue of whether defendant should continue to pursue negotiations with the plaintiff. The evidence showed that a majority of those attending the meeting expressed concern about the pending deal.

Between December 22 and December 30, 1992, Chazen sent Kissel, or at times Erik, various documents which had either additional or contradictory terms to the 11/25 agreement. Examples of additional terms include, but are not limited to, the terms governing the consultation and non-competition provision of the agreement and terms relating to warranties and covenants. Examples of contradicting terms are the purchase price,[2] the creation of LeBon, Inc. as the buyer, and the difference in the interest rate charged on the post-closing payments to be made by the plaintiff.[3] None of these proposed terms were binding on the parties since neither party signed off on the documents in question.

It is here noted that plaintiff did indeed remit the $450,000 in a form of a bank check to be deposited at defendant's bank. This check was received by defendant but was never deposited nor cashed, and it was returned to plaintiff after it became apparent that the 11/25 agreement would never be realized.

The plaintiff now brings the suit against the defendant alleging breach of contract.

## II.

This is a classic contract dispute case where one side is claiming "contract" and the other is asking "what contract?" Thus, as is the case with all contract disputes, the destiny of the parties lie in the question of whether there is a contract binding the parties to the terms therein. And if not, whether there is, at a minimum, a preliminary agreement giving rise to a duty to negotiate the open terms further in good faith.

The defendant contends that although talks were had by the parties involved and a document was drawn up and signed by both parties, this combination in no way obligates the parties to perform under the tentative 11/25 agreement. It is alleged that there were material terms missing in the said agreement which foreclosed the possibility that the agreement be binding on the parties, irrespective of their intent when signing the document. Moreover, it is argued that even if certain obligations did indeed arise out of the 11/25 agreement, at best, the only such obligation would be an obligation to negotiate further in good faith. And, since the defendant has negotiated in good faith, he contends that the agreement was not breached by him.

The plaintiff, on the other hand, argues that the 11/25 agreement was a binding contract giving rise to certain rights and obligations. He claims that the defendant breached this contract. Alternatively, plaintiff argues that the document represents a preliminary agreement giving rise to an obligation to negotiate further in good faith, an obligation which the defendant has breached by failing to close on the deal as contemplated by the parties.

■ It is now plain that, under New York's contract law, the parties must not only have the intent to be bound by the terms of an agreement, but the agreement itself must contain all material terms in order to give rise to a binding contract. *See Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978); *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1119 (S.D.N.Y. 1987). As the Second Circuit has explained:

> [t]o consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation. (citation omitted). If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result.

---

**2.** The apportionment between the purchase price and the fees to be paid under the consulting and non-compete agreement varied from the 11/25 agreement to the proposed documents.

**3.** The 11/25 agreement called for an interest rate of seven percent over prime, but these documents called for seven *base* points over prime.

*Solomon*, 583 F.2d at 593. It has been said that the "definiteness as to material matters is of the very essence in contract law," *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981), and hence, without such terms, there would be no binding contract between the parties, irrespective of the parties' intent when forming the agreement. This is because where the parties have not provided all material terms of their contract, there is no standard by which a court can determine what constitutes a breach of that agreement. *See Rosenthal*, 674 F.Supp. at 1119.

In the instant matter, the agreement at issue is the 11/25 agreement. From the record, there is no dispute that the parties had the requisite intent to be bound to the terms of the agreement when they were signing the agreement. As a matter of fact, the defendant even testified during trial that by signing the agreement, he thought that "they had a deal."

The fact that the intent to form a binding contract was present does not end our inquiry, however. As stated earlier, the Court must now determine whether all of the material terms are present and stated in the agreement with the required amount of specificity. With this in mind, the Court examines the 11/25 agreement.

The agreement, on its face, purports to be a binding contract for the sale of SLE. There are many sub-parts integrated into the agreement. These sub-parts primarily consists of the terms of the stock sale, the consulting and non-compete clause, the benefits defendant is to receive after the sale, and the drawing up of further documents. After a careful review of the agreement, the Court determines that certain material terms have in fact been omitted, and accordingly, this determination forecloses the possibility of finding a binding contract between the parties in question.

There are many instances of such an omission. The first and foremost example is the consulting and non-compete clause. In New York, certain terms are considered to be material and thus are required in employment contracts. More specifically, in order for an employment contract to be effective and binding certain elements must be present. "These elements consist of the identity of the parties, the terms of employment, which include the commencement date, the duration of the contract and the salary." *Merschrod v. Cornell University*, 139 A.D.2d 802, 805, 527 N.Y.S.2d 109, 111 (3d Dep't 1988). The requirement that certain material terms be present also holds true for non-competition agreements. In such agreements, the required material terms include the duration, the scope and the extent of the non-compete agreement between the parties. *See Carvel Corp. v. Eisenberg*, 692 F.Supp. 182, 186 (S.D.N.Y.1988); *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679, 353 N.E.2d 590, 592 (1976). As such, when parties attempt to create binding obligations by entering into a contract for employment and/or non-competition, the parties must include the aforesaid terms in the agreement for the courts to give it any effect.

In the case at bar, paragraph five of the 11/25 agreement states:

5) In addition seller shall be paid as consultant and pursuant to a non-compete agreement the following sums:

a) the sum of 2,352,000 U.S.D.

b) a sum equivalent to interest calculated monthly in the amount from time to time outstanding at the rate of prime plus 7% subject to a minimum rate of 10% and a maximum rate of 15% such parameters being subject to review by the parties if prime at any time exceeds 8% or falls below 3% and in the event of disagreement settled by the company's Accountant.

By 60 monthly payments equivalent to payments of principal and interest the first payment to be made one month after closing.

From examining the language of paragraph five, it becomes apparent that the 11/25 agreement is lacking certain material terms. The terms omitted by the agreement include the terms of employment, the salary, and also the scope and the extent of the non-compete agreement between the parties.

The lump sum apportioned to the employment/non-compete clause does in no way allocate a specific amount to the employment agreement, and as such, the Court is not able to determine what defendant's salary would be under the employment contract. As stated earlier, all these terms are considered essential to a contract which contains within its four corners an employment agreement and a non-competition clause.[4] These are plain "open terms" and not ambiguous terms which need to be interpreted. As such, these missing material terms alone are enough to destroy the binding force of the 11/25 agreement, and hence, without such terms, there cannot be a valid contract binding the parties in question.

■ This conclusion, however, does not wholly end our inquiry. In *Teachers Ins. and Annuity Assoc. v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), Judge Leval opined that

[p]reliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiations. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... (citation omitted)."

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.

*Tribune Co.*, 670 F.Supp. at 498; *see Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989). The primary difference between the two types of preliminary agreements is that the former binds the parties to the actual terms of the contract despite the anticipation of drawing up further documents, where the latter does not bind the parties to the actual terms of the contract but, rather, commits the parties to negotiate the open terms further in good faith to carry out the ultimate objective of the initial incomplete agreement. *Id.* Thus, parties in preliminary agreements of the second type would not breach their obligations if, ultimately, the agreement is not finalized because of good faith differences in the negotiation of the open issues. *Id.* What it does forbid a party from doing, however, is renouncing the deal, abandoning negotiations, or insisting on conditions that do not conform to the preliminary agreement. *Id.*

■ As discussed earlier, the 11/25 agreement omitted certain material terms considered essential to the overall contract. This

4. Plaintiff initially alleges that the missing terms are not material because defendant was to retire after the transaction was completed. This argument fails for two reasons. First, the argument does not address the material terms missing in connection with the employment contract; it only deals with the non-compete clause. And second, the four corners of the contract does indeed place an emphasis on the non-compete clause, and thus, the Court will not look beyond the agreement in order to determine whether the parties actually meant what they said.

Plaintiff further alleges that the terms are not missing because reference can be made to the Boyes transaction. This argument fails because, from the record, it is unclear whether the parties had wanted to agree on the same conditions as stated in the Boyes transaction *at the time the 11/25 agreement was signed*. That is, the Court is not satisfied that the agreement can be rendered reasonably certain by making a reference to an extrinsic standard. *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989).

determination necessarily forecloses the possibility that the said agreement falls within the first type of *Tribune*'s preliminary agreement; an agreement which requires only a more formal memorialization but is complete in all other respects. Moreover, this determination also forecloses the possibility that the 11/25 agreement falls within second type of *Tribune*'s preliminary agreement. This conclusion is reached because the *Tribune* court made it clear that "if the agreement is too fragmentary, in that it leaves open terms of too fundamental importance, it may be incapable of sustaining binding legal obligation." *Tribune*, 670 F.Supp. at 497. That is exactly what occurred here. Accordingly, the Court determines that the 11/25 agreement has no legal effect on the parties in question.

■ Even if the Court was to assume, for the sake of argument, that the missing terms are not of fundamental importance, and further, that plaintiff is able to demonstrate that the 11/25 agreement does indeed fall within a type two preliminary agreement, the plaintiff still would not have any remedy in the case at bar since the Court determines that neither party has breached their obligation to negotiate further in good faith.

■ It is now well settled that a duty to negotiate in good faith does not encompass an automatic duty to approve the final deal. As the Court stated in *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir.1988),

> [i]n a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

*Id.* at 1223. Thus, there is only a promise to negotiate further in good faith and no promise that such negotiation would be fruitful.

From the facts of our case, both parties did indeed attempt to negotiate the missing terms in good faith. Both parties proposed different terms of the agreement during the negotiations which continued for over a month after the signing of the 11/25 agreement. The negotiations broke down and the deal fell through only because each party was seeking terms to their own advantage, a practice which is permitted and not considered to be bad faith. *See Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd.*, 734 F.Supp. 1181, 1190 (D.Md.1990), *aff'd*, 1991 WL 125666, 1991 U.S.App. LEXIS 14,891 (4th Cir. July 12, 1991). "[I]ndeed, negotiations would not even be necessary if each party were not attempting to secure favorable provisions as a part of the final agreement." *Id.*

The evidence at trial revealed that the attorney for plaintiff sent several proposed agreements dealing with the stock purchase agreement, the non-compete agreement and the pledge agreement to the defendant. These documents contained many terms which are essential to the fulfillment of the 11/25 agreement but which were never addressed in the original agreement. Within these proposed agreements, genuine disputes arose as to their terms. For example, there were disputes concerning the assignment of rights made by the plaintiff to LeBon, a corporation formed to act as the buyer under the 11/25 agreement. Defendant alleged that such an assignment would adversely affect his rights since the 11/25 agreement was signed with the assumption that plaintiff would be the buyer. This was important to the defendant because such an arrangement would obligate the plaintiff to be liable for the post-closing payments. Although this argument fails on a legal basis, *see Quintel Corp. N.V. v. Citibank, N.A.*, 596 F.Supp. 797, 800 (S.D.N.Y.1984) (absent consent to an assignment, the assignor is not relieved of his obligations under the contract), it does set a platform for the main dispute between the parties.

The dispute which ultimately caused the downfall of the 11/25 agreement was the dispute over whether plaintiff would personally guarantee the post-closing payments to the defendant. Such personal guarantee was of the utmost importance to the defendant.

Defendant insisted on such a guarantee, but plaintiff refused.

■ In order to determine whether negotiations were had in good faith, the Court must first look to the language of the agreement which gave rise to the obligation of good faith. As stated previously, the obligation to negotiate in good faith has been generally described as preventing one party from, "renouncing the deal, abandoning the negotiation, or insisting on conditions that do not conform to the preliminary agreement." *Tribune,* 670 F.Supp. at 498. Thus, the full extent of a party's duty can only be determined from the terms of the preliminary agreement itself. *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155, 158 (7th Cir.1989) (citing *Feldman v. Allegheny Int'l, Inc.,* 850 F.2d 1217 (7th Cir.1988) (the letter of intent controlled the scope of the obligation to bargain in good faith)). If the language of the preliminary agreement fails to state any relevant agreed terms or fails to give a general framework within which to conduct the negotiations, the parties are free to insist on or reject any proposed terms to the contract as they wish.[5] *Apothekernes Laboratorium,* 873 F.2d at 159.

In the case at bar, the 11/25 agreement is silent as to whether the plaintiff would be personally liable to the defendant for the post-closing payments. As such, any proposal made in connection with the personal guarantee would not be considered "bad-faith" so long as it comports to the general framework laid out within the language of the 11/25 agreement.[6] With this in mind, the Court finds defendant's insistence on plaintiff's personal guarantee not to, explicitly or implicitly, offend the general framework of the 11/25 agreement. Indeed, it would be considered good business practice for the seller to insist on such a guarantee. Concomitantly, however, the Court also finds plaintiff's refusal to give the said guarantee not to offend the 11/25 agreement; such refusal makes sense since it would protect the plaintiff from personal liability. Thus, through the demands, the parties were merely attempting to secure their best interest through the negotiations. Such actions can hardly be labeled "bad faith." Based on this reasoning, the Court determines that neither the plaintiff nor the defendant has breached their duty to negotiate further in good faith.

### III.

For the foregoing reasons, it is the determination of this Court that the 11/25 agreement failed to give rise to any binding legal obligation on either the plaintiff or the defendant. Moreover, even if the Court assumes for the sake of argument that the circumstances gave rise to a preliminary agreement of the second type under *Tribune,* the Court nevertheless finds neither party breached his duty to negotiate further in good faith. Accordingly, judgment is entered for defendant Dunk.

**IT IS SO ORDERED.**

---

**5.** Since this is the relevant law, plaintiff's argument that defendant should have known that plaintiff was not going to give him a personal guarantee fails. Such an assertion, if true, should have been part of the language of the preliminary agreement.

**6.** The 11/25 agreement did not set forth any previously agreed terms made in connection to the personal guarantee much less provide a general framework within which the parties intended to conduct their negotiations. *See Apothekernes Laboratorium,* 873 F.2d at 159.