Peter SHANN, Plaintiff–Appellant,

v.

John S. DUNK, Defendant–Appellee.

John S. DUNK, Plaintiff–Appellee,

v.

Peter SHANN, Defendant–Appellant.

No. 93, Docket 94-9316.

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 1995.

Decided May 10, 1996.

Peter S. Herman, New York City (Craig S. Brown, McLaughlin & Stern, New York City, of Counsel), for Plaintiff–Appellant.

James H. McGowan, Syracuse, NY, (Cherundolo, Bottar & McGowan, Syracuse, NY, and Joseph Serino, Jr., Hiscock & Barclay, Syracuse, NY, of Counsel), for Defendant–Appellee.

Before: WINTER, JACOBS, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Peter Shann brought this suit against John S. Dunk ("Dunk")[1] to enforce an agreement for Shann's purchase of Dunk's controlling shares in an explosives company. The agreement, which was made on November 25, 1992 (the "November 25 Agreement"), was in rough preliminary form and contemplated memorialization in a more formal contract. It provided for: a down payment of $500,000; monthly payments to Dunk totalling $2,352,-

---

1. "Dunk" alone, as used in this opinion, refers to the seller John Dunk. All mentions of his son Erik Dunk use only the first name Erik.

000, plus interest, over five years "as [a] consultant and pursuant to a non-compete agreement" (the "consult/noncompete clause"); and a payment of $360,000, plus interest, to be made after five years to Dunk's daughter in exchange for her stock. The district court ruled after trial that the consult/noncompete clause lacked essential terms relating to compensation and scope, rendering the overall agreement void and unenforceable. The court, accordingly, ruled for defendant Dunk. We disagree with the district court's analysis. In our view, the precise terms of the consult/noncompete agreement were neither essential, nor missing. Nonetheless, we find other unresolved questions as to whether the November 25 Agreement is enforceable, and, if so, whether either of the parties breached it. Accordingly, we vacate the district court's judgment and remand for further findings.

## I. *Background*

Shann, a British citizen and resident, is a principal in the manufacture and sale of explosives for mining, primarily in the United Kingdom. Dunk is the controlling shareholder of St. Lawrence Explosives Corp. ("SLE"), a New York corporation with its principal place of business in Adams Center, near Watertown, New York. SLE manufactures low-grade explosives, and provides drilling and blasting services. Dunk owns 242 of the 333 outstanding shares of SLE; the remainder are owned by his daughter Deborah Netto (60 shares), his son Erik (27 shares), and SLE's president, Julie Pecori (4 shares).

Dunk reached 65 years of age in 1991 and was eager to retire. Since June 1988, he had been seeking to sell his controlling shares of SLE. Prior to the events giving rise to this action, Dunk had negotiated with numerous prospective buyers, including Shann, but never reached an agreement.

In the fall of 1992, after a proposed sale fell through, Dunk's son Erik contacted Shann, proposing that Shann purchase SLE. Because of the failure of their previous negotiations, Shann insisted, before he would come to the United States to explore the sale in depth, that Dunk commit himself to an option agreement that would obligate Dunk to sell his shares. In the course of the negotiations, Shann apparently made clear to Dunk that Shann would not undertake personal responsibility for deferred payments. Shann and Dunk eventually agreed on November 6, 1992, to an option for the sale of SLE. The terms involved a down payment of $1,712,000, plus additional payments of $1,500,000 over six years, pursuant to a consult/noncompete clause. When the option contract had been agreed upon, Shann and his solicitor, Reginald Ashworth, came to Watertown to work out the sale with Dunk. However, this option arrangement failed to result in a sale of the company because of the parties' inability to secure necessary financing. The proposed lenders refused to extend credit without Shann's personal guarantee, which Shann refused to give.

Shann then departed on business, leaving Ashworth in Watertown to negotiate further with Dunk. On the evening of November 24, 1992, Dunk said to Ashworth, "I'm thinking about financing the deal for you." The next morning, November 25th, Dunk proposed the terms of an agreement which were satisfactory to Ashworth. Ashworth put the terms down on paper, and secured Shann's approval. Dunk signed the agreement; it was then faxed to Shann in England, who also signed it.

The November 25 Agreement provided that Dunk would sell Shann his 242 shares of SLE and also procure his daughter's 60 shares for sale to Shann. The payment terms read as follows:

3) A deposit of 50,000 U.S.D. shall be paid to ... the seller within 14 days....

4) The sum of 450,000 U.S.D. shall be paid by the buyer to the seller at closing....

5) In addition seller shall be paid as consultant and pursuant to a non-compete agreement the following sums:

a) the sum of 2,352,000 U.S.D.

b) a sum equivalent to interest calculated monthly in the amount from time to time outstanding at the rate of prime plus 7% subject to a minimum rate of 10% and a maximum rate of 15 %....

6) In addition Deborah will be paid the following sums by the company:

a) the sum of 360,000 U.S.D. 60 months after closing or earlier by agreement.

b) a monthly sum equivalent to interest calculated in accordance with clause 5(b) the first payment to be made one month after closing.

Paragraph 10 of the Agreement provided that "Buyer will present to Seller a purchase agreement basically including [the terms and conditions of the November 25 Agreement and] a pledge of all shares acquired to seller as security to the seller for fulfillment of the agreement...." [2] Both sides agreed that they considered the November 25 agreement to be binding, notwithstanding its expected replacement by a more elaborate, formal contract.

Dunk and Shann then engaged counsel to draft the final stock purchase agreement. Around December 2, 1992, Shann wired the $50,000 deposit to Dunk in accordance with the November 25 Agreement.

Soon thereafter, Dunk's attorney, William Kissel, argued to Shann's attorney, Hartley Chazen, that the allocation of $500,000 to the stock purchase and $2,352,000 to the consult/noncompete clause was inappropriate and, for tax reasons, unfair to Dunk, as it would cause him to be taxed at the higher ordinary income rates (instead of capital gain rates) for the major part of the proceeds. Ashworth authorized Chazen to change the allocation.

On December 17 and 18, Chazen sent memos to Kissel outlining the structure of the contract he was drafting. The proposal described in these memos differed in certain respects from the November 25 Agreement. For example, it included Shann's purchase of Erik Dunk's stock, which had not been mentioned in the November 25 Agreement. It stated that the shares of SLE would be purchased by a newly formed New York corporation, to be named Lebon II, Inc. And, in response to Kissel's complaint about the unfair allocation as between purchase price and consult/noncompete, Chazen's memo as-

signed $1,500,000 to the "employment contract," apparently without interest.

On December 22, 1992, shortly after receiving this memo, Dunk met with his advisers. They took exception to changes suggested in Chazen's memo and expressed the view that the deal did not give Dunk sufficient security. They urged Dunk not to go through with the transaction. After the meeting, Kissel wrote to Dunk saying that the meeting had been "extremely productive and helpful [and that] .... hopefully we can get this sale done for you, one way or another, with or without Peter [Shann]!"

On December 24, Dunk faxed a letter to Shann. The central message of the letter was that Dunk required Shann's guarantee of the deferred payments, or some other form of security. He wrote, "I need more comfort than *your words* .... I must have your personal guarantee, or posted Bonds.... I trust you can relieve my concerns, and come up with the Security I need to bring this deal to fruition."

At the same time, Dunk sent to Shann (and Kissel sent to Chazen) a letter drafted by Kissel, asserting that "several aspects of the transaction as outlined [in Chazen's memo] are not acceptable to my client and I am writing to outline the transaction as it would be acceptable to my client." The transaction that "would be acceptable" to Dunk was in numerous respects very different from the November 25 Agreement. For example, it called for payment of $1,452,000 at closing (instead of $500,000), interest of 15% (instead of 7 percentage points over prime, which at the time came to 13%), and payment to Dunk's daughter spread over five years (instead of deferred to the end of five years). Kissel's letter required that Shann personally guarantee all the purchase obligations.

Shann sent Dunk proposed closing documents, along with a bank check for $450,000. Dunk refused to sign, saying both that the closing documents departed from the terms of the November 25 Agreement and that he would not do the deal without Shann's guarantee. Dunk did not cash Shann's check.

2. The November 25 Agreement did not contain a merger clause.

Shann then sent Ashworth from England to Watertown to attempt to salvage the deal. Ashworth offered to eliminate any terms from the closing documents that were at variance with the November 25 Agreement— offering essentially to close on the November 25 Agreement, which Shann and Ashworth insisted did not include a personal guarantee by Shann of the deferred payments. Dunk refused, continuing to insist on Shann's guarantee.

On February 1, 1993, Dunk filed suit in New York state court seeking a declaration that the November 25 Agreement was unenforceable or, in the alternative, that Shann had breached the agreement. Shann then commenced suit in federal district court alleging that Dunk had breached the contract. Shann removed Dunk's state court action to federal court, and the two cases were consolidated.

A five-day bench trial was held in August 1994, and the court issued its decision in favor of Dunk on November 25, 1994. *Shann v. Dunk,* 870 F.Supp. 460 (N.D.N.Y. 1994). The court found the November 25 Agreement unenforceable because it lacked certain essential terms relating to the consult/noncompete clause, particularly "the terms of employment, the salary, and also the scope and extent of the non-compete agreement between the parties." *Id.* at 465.

After the court entered judgment, Shann moved, pursuant to Fed.R.Civ.P. Rule 59(e), to amend the judgment to require Dunk to return Shann's $50,000 deposit with interest. The court denied the motion because Shann had failed to raise the issue prior to judgment.

## II. *Discussion*

■ We review the district court's factual findings for clear error, and we consider *de novo* the court's conclusions of law. *United States v. Blue,* 78 F.3d 56, 59 (2d Cir.1996). The central issue—whether, based on the factual findings, a binding contract existed— is a question of law that we review *de novo. Ronan Assocs. v. Local 94–94A–94B,* 24 F.3d 447, 449 (2d Cir.1994). It is undisputed that New York law governs this action.

■ Ordinarily, preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations. *See Carmon v. Soleh Boneh Ltd.,* 206 A.D.2d 450, 450, 614 N.Y.S.2d 555, 556 (2d Dep't 1994), *appeal denied,* 85 N.Y.2d 804, 626 N.Y.S.2d 756, 650 N.E.2d 415 (1995); *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 261 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). Nonetheless, we have recognized that in some rare instances, if a preliminary agreement clearly manifests such intention, it can create binding obligations. *See Arcadian,* 884 F.2d at 72; *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497–99 (S.D.N.Y.1987). The *Tribune* opinion, which developed a taxonomy for such circumstances, observed that binding preliminary contracts fall into at least two categories. Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework. *Arcadian,* 884 F.2d at 72; *Tribune,* 670 F.Supp. at 498.

It seems clear, and the district court found, that, notwithstanding their intention to sign a more elaborate and formal contract, the parties viewed themselves as having reached a complete agreement on all significant terms on November 25, 1992, and intended to be bound. Although the parties recognized that the final contract would include additional "boilerplate," they foresaw no disputes relating to the boilerplate. Accordingly, the parties viewed their contract as either a binding Type I agreement (for the

sale of the SLE stock) in which everything had been agreed and all that remained was the need for lawyers' embellishments, or a binding Type II agreement (to negotiate in good faith) in which all the important terms were settled and the parties agreed to negotiate in good faith over any differences that might arise relating to the undrafted boilerplate.

## A. Did the November 25 Agreement Lack Essential Terms?

### (1) Consult/Noncompete Clause

Relying on New York law to the effect that contracts are unenforceable unless they cover all essential terms, *Brookhaven Hous. Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir.1978); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981),[3] the district court ruled that no binding contract for the sale of SLE had been formed because essential terms relating to the consult/non-compete clause were lacking.

We disagree. While the terms of an employment contract and noncompete agreement undoubtedly can be of great importance, the evidence suggests that they had no importance here. It was clear beyond doubt that the structure of the November 25 Agreement—allocating $500,000 for Dunk's stock and $2,352,000 for his consult/noncompete agreement—was a fiction. It did not accurately represent the views of either of the parties as to the relative worth of the separate elements of the transaction, but was inspired by the hope of securing tax benefits.

Dunk had decided after passing his 65th birthday in 1991 to retire. In 1989, he had resigned as chief executive of SLE; he ceased to be involved in day-to-day affairs, came into the office only two to three times per week, and limited his involvement to general oversight and major decisions. As he got older, he found it "imperative" that he "get out." Because he wanted "to continue to … rub shoulders" with people in the industry, the agreement provided that he would continue for five years to represent the company in trade associations. It also gave him a car at company expense and health coverage. As to his expected duties, however, he testified, "I believe there is some other writing someplace that talks about exactly what they expected me to do. Very limited."

It was clear to Dunk that the "guts of the deal" was money in exchange for stock. Dunk had quoted his price as $3,212,000. So far as the evidence showed, at no time did Shann negotiate for any commitment of the amount of time, or the degree of service, Dunk would render. Neither side had an interest in the scope of the noncompete clause, because Dunk, entering retirement, had no intention to compete. In fact, representatives of both sides testified that they

---

**3.** *See also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir.), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482, 548 N.E.2d 203, 206, 548 N.Y.S.2d 920, 923 (1989), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990).

Some earlier New York state court decisions refer to the absence or presence of "material" terms in determining whether a contract is enforceable. *See, e.g., Schumacher*, 436 N.Y.S.2d at 249, 417 N.E.2d at 543 ("a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable"). However, in determining the sufficiency of a contract, we have traditionally spoken of whether it contained all the necessary "essential" terms. *See, e.g., Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir.1989) (citing *Schumacher*, yet referring to omission of essential, rather than material, terms); *Solomon*, 583 F.2d at 593. Ap-

parently, this is also the more recent trend in the New York courts. *See, e.g., J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 876, 626 N.Y.S.2d 52, 53, 649 N.E.2d 1196, 1197 (1995) (record unclear as to whether parties agreed to provision as "essential" term of contract); *Cobble Hill*, 548 N.Y.S.2d at 923, 548 N.E.2d at 206 (parties to contract must manifest mutual assent to "essential" or "material" terms); *Chan v. Bay Ridge Park Hill Realty Co.*, 213 A.D.2d 467, 469, 623 N.Y.S.2d 896, 897 (2d Dep't 1995) (concluding that parties did. not enter binding contract because of the absence of "essential" terms). Without commenting on whether the two terms are interchangeable, we will refer in this opinion to "essential" terms. *Cf. In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 523 n. 5 (Bankr. E.D.N.Y.1994) ("A material term is any term properly bearing upon the subject matter of the contract. Essential terms are those items whose agreement is prerequisite to the formation of a contract.").

considered the precise terms of the consult/noncompete agreement to be of little importance. The reason for casting the payments in terms of compensation for Dunk's agreement to consult and not to compete was that such payments are deductible while stock purchase payments are not. A tax deduction for these payments, if allowed, would result in a great tax saving to SLE, thus permitting a larger overall payment to Dunk out of SLE's cash flow. If the payments had really been compensation for services rendered during the five years, there would have been no reason to impose an interest charge. In sum, the evidence showed that, in economic reality and in the view of the parties, this was nothing but a stock purchase agreement, with a large portion of the payment disguised as compensation for services in order to make it deductible.

Rather than assessing the presence or absence of "essential terms" in accordance with economic reality and the views of the parties, however, the district court read the contract at face value. The court stated, "the four corners of the contract ... place an emphasis on the non-compete clause, and thus, the Court will not look beyond the agreement in order to determine whether the parties actually meant what they said." *Shann,* 870 F.Supp. at 466 n. 4.

■ There is no legal doctrine that requires a court to restrict its examination to the "four corners" of a contract to determine whether omitted terms are essential. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43

L.Ed.2d 148 (1975) (in determining enforceability of contract, court may look outside its "four corners" to consider factors such as circumstances surrounding its formation); *Huertas v. East River Hous. Corp.,* 992 F.2d 1263, 1267 (2d Cir.1993) (same). To the contrary, New York law requires realistic flexibility. It requires use of a standard that is "necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties." *Cobble Hill,* 548 N.Y.S.2d at 923, 548 N.E.2d at 206. In other words, as we have noted before, a court should consider the broad framework of a contract in determining whether missing terms are actually essential—that is, necessary to make the agreement legally binding.[4] Disputed terms "are not to be considered in isolation, but in the context of the overall agreement." *Tribune,* 670 F.Supp. at 500.

■ We conclude that the district court erred in finding that the November 25 Agreement was void by reason of the absence of essential terms related to the consult/noncompete clause. The missing terms, if any,[5] were of no importance to the parties.

### (2) *Obligation for Deferred Payments*

■ Nonetheless, we are unable to conclude on the present record and findings that the November 25 Agreement was sufficiently complete to constitute an enforceable contract for the sale of SLE because of uncertainty regarding a far more important term—whether Shann was personally obli-

---

4. *See Ginett v. Computer Task Group, Inc.,* 962 F.2d 1085, 1099 (2d Cir.1992) (contract's noncompete clause was not essential at time contract was signed); *see also Lande v. Radiology Specialists of Kingston P.C.,* 806 F.Supp. 1084, 1092 n. 11 (S.D.N.Y.1992) (disputed contract provision was not essential, nor was it discussed or even raised by plaintiff prior to litigation).

5. It appears, in any event, that the essential terms of the consult/noncompete clause were not missing. The contract specified that Dunk would serve *as a consultant, for five years,* and added that he would represent the company in specified capacities. And by saying that Dunk would *not compete,* without suggesting any limitation on scope or extent, the contract apparently meant to

say that Dunk would not compete *at all* (which was, indeed, his intention). Dunk's pay was specified by the allocation of $2,352,000 over five years with interest at a specified rate, plus benefits including health insurance and a company car.

Alternatively, there was evidence from which the court might have found that the parties intended to plug into the final contract the terms of a consult/noncompete clause that had been drafted in connection with one of Dunk's earlier efforts to sell his company. In either case, the important point was that neither side considered the consult/noncompete agreement significant, except to the extent it would produce favorable tax consequences.

gated with respect to the very substantial deferred payments. This issue was obviously of great importance to the parties. Without Shann's guarantee, Dunk's receipt of the large deferred payments would depend on the sufficiency of SLE's future cash flow. Dunk feared he would be at the mercy of Shann's good faith and good management. Shann could divert SLE's profits to another entity, or, if it was unprofitable, let it run into the ground, leaving Dunk holding the debt of an insolvent company. As for Shann, he was deeply committed to the principle that he should in all possible circumstances avoid personal responsibility. He believed, furthermore, that the purpose of the high interest rate provided by the November 25 Agreement (prime plus 7 percentage points) was to compensate Dunk for the risk that the future payments might not materialize. Shann made clear that he refused to purchase the SLE shares under terms that would leave him liable for the deferred payments. We conclude that the issue of Shann's responsibility for deferred payments was an "essential" term.

The November 25 Agreement, on its face, is somewhat unclear as to who would be Dunk's obligor for the deferred payments.

Dunk argues that because the agreement is made solely "between John S. Dunk (Seller) and Peter Shann (Buyer)" and specifies that "seller shall be paid" the deferred sums without designating any other payer, the agreement should be understood to place that payment obligation on Shann. Dunk testified several times that this was his understanding of the agreement.

Shann, on the other hand, contends that the text of the November 25 Agreement shows he is not personally obligated to make or guarantee the deferred payments, or that it is in any event ambiguous. He notes that while paragraph 4, covering the payment of $450,000 at closing, states that it is to be paid "by the buyer," paragraphs 5 and 6, covering deferred payments, do not refer to the buyer. Indeed, paragraph 6 expressly states that Deborah would be paid "by the company." And paragraph 5 states that Dunk "shall be paid as [a] consultant and pursuant to a non-compete agreement," implying that he would

be paid by the entity that would employ him as a consultant, and against which he would not compete—*i.e.,* the company.

The district court's findings on this issue are somewhat confusing. At one point, the court observed that Dunk was "nervous of the fact that the [November 25] agreement did not call for the personal guarantee of [Shann]." *Shann,* 870 F.Supp. at 463. Elsewhere, the court stated that "the [November 25] agreement is silent as to whether [Shann] would be personally liable to [Dunk] for the post-closing payments." *Id.* at 468.

It is clear to us that the written agreement of November 25 is sufficiently ambiguous on the question of Shann's personal liability for the deferred payments to justify consideration of all the extrinsic evidence of the parties' negotiations and conduct to determine the meaning of the contract. *United States Fire Ins. Co. v. General Reinsurance Corp.,* 949 F.2d 569, 571 (2d Cir.1991); *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Indeed, admission of parol evidence is particularly warranted here because "a court should find an agreement too indefinite [to be enforced] only as a 'last resort' when it is 'satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear.'" *Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 840 (2d Cir.1993)(quoting *Cobble Hill,* 548 N.Y.S.2d at 923, 548 N.E.2d at 206).

Shann argues that any ambiguity in the express contract terms is resolved by substantial evidence showing that Dunk understood and agreed that Shann would not be liable. In the early discussions, Dunk and his representatives had sought Shann's personal commitment to make the deferred payments, and Shann had emphatically refused. Dunk understood from the start, and recorded in his notes, that the deferred payments were to come from the cash flow of SLE. He was aware that, during the discussions attempting to bring the option to fruition, Shann consistently refused to guarantee the payments, which resulted in the failure of the option to be consummated. Dunk acknowledged that, shortly prior to making the November 25 Agreement, Ashworth had re-

peated to him that Shann would not give a guarantee. Dunk had then proposed to finance the deal himself, and proposed the high interest rate of 7 percentage points above prime to compensate himself for the substantial risks he would be taking. When Dunk discussed the draft agreement on November 25 with his accountant Lou Adams, he understood that the deferred payments would be made by SLE and would be tax deductible to it. When he met with his advisers on December 22, according to the testimony of Julie Pecori, Dunk told his advisers that Shann would not guarantee the deferred payments. Dunk received emphatically negative advice from his advisers who stressed the need for "security," and pointed out that security consisting only of a pledge of the shares of the corporation being sold was of little value since the corporation "could be ruined before the former owner would ever realize what had happened." He wrote to a private investigator (whom he had engaged to check Shann's financial situation) that Shann "refuses to give me *Any* Guarantees or Security other than the [pledge of the] Corporate Stock." Dunk faxed Shann, saying "I must have your personal guarantee, or posted, Bonds or whatever to back this deal.... [T]his deal needs better financial security for the Seller, and that is *me!* ... I trust you can relieve my concerns, and come up with the Security I need to bring this deal to fruition." According to Shann's argument, the fact that Dunk demanded Shann's guarantee, rather than arguing that it was already promised under the November 25 Agreement, shows that Dunk understood he had received no promise of Shann's guarantee on November 25. Finally, Dunk acknowledged in his deposition that in making these demands for Shann's guarantee, he was asking for more security than he had in the November 25 Agreement.

We remand to the district court to determine, in consideration of all the surrounding evidence, whether Shann did, or did not, undertake personal responsibility for the deferred payments, or, alternatively, whether the parties had failed to reach an understanding on that question.

## B. *Proceedings on Remand*

We believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term. We recognize that voiding an agreement for absence of an essential term is a step that courts should take only in rare and extreme circumstances. *See Mar Oil*, 982 F.2d at 840; *Weinreich v. Sandhaus*, 850 F.Supp. 1169, 1177 (S.D.N.Y. 1994). Such rulings may undermine settled expectations. We would countenance such a result in this case because of (1) the great importance of the unagreed term, (2) the fact that the agreement was of the preliminary sort that expressly called for further formalization, and (3) the fact that the lack of agreement (if the district court so finds) came to light so soon after signing that the parties had not relied to any significant extent on their apparent contractual rights and obligations.

Part of the reason courts are reluctant, in the absence of clear expressions of intent by the parties, to make such preliminary agreements binding is the higher likelihood, where there has not been an opportunity for careful drafting and painstaking review, that ambiguous formulations will create the appearance of agreement where in fact there is none. Given the special circumstances of this case, if the district court finds that the parties failed to resolve the issue of Shann's liability, it must conclude that the agreement was illusory (because the parties were in fact in unrecognized disagreement over one of its most important terms) and treat the contract as void.[6] *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir.), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Brookhaven*

---

6. On these facts, such a circumstance would not justify finding a limited commitment of *Tribune*'s Type II. Although *Tribune*'s Type II *can* apply where the parties have not agreed on a term of significance, that would be so only where the parties clearly manifested a mutual intent to be so bound. There is no suggestion in the evidence that Shann and/or Dunk believed that the issue of Shann's personal responsibility remained open and that they intended to be bound on other agreed issues while negotiating in good faith to resolve that open question.

*Hous. Coalition,* 583 F.2d at 593; *Oscar Prods., Inc. v. Zacharius,* 893 F.Supp. 250, 254–55 n. 3 (S.D.N.Y.1995).

If, on the other hand, the parties had reached agreement on the question of Shann's liability, then the district court must decide whether they had an agreement of *Tribune*'s Type I or Type II. *See Tribune,* 670 F.Supp. at 498. If the district court finds that there were no issues outstanding that were perceived by the parties as requiring negotiation, their agreement should be seen as at Type I binding obligation for the sale of SLE. Shann and Dunk could have closed their deal directly on the November 25 Agreement, foregoing the luxury of lengthy formalized contracts. And either party's refusal to perform in accordance with the agreed terms would constitute an actionable breach.

Alternatively, on the assumption that the parties had agreed on the question of Shann's liability for the deferred payments, the contract might be seen as a more limited agreement of *Tribune*'s Type II, by reason of the boilerplate that remained to be drafted. Although such incomplete agreements are normally not binding, if the parties choose they can bind themselves "to negotiate together in good faith in an effort to reach final agreement within the scope" of the terms that have already been agreed. *Id.*

Thus, if Shann and Dunk had agreed on various terms and accepted a clearly manifested binding obligation to negotiate the open terms in good faith within the agreed boundaries, the law would not deny their enforceable contract rights merely because there were terms that remained to be negotiated. If the parties then failed to reach such agreement despite good faith negotiations within the agreed limits, no breach occurred. If, on the other hand, a party refused to adhere to the already agreed terms, or otherwise acted in bad faith, that would constitute a breach of the Type II agreement.

In sum, if the district court finds that the parties resolved the question of Shann's liability for deferred payments, it will need to decide whether their agreement was Type I or Type II and whether either side breached. As noted above, if the district court con-

cludes that the issue of liability for deferred payments was not resolved, then the parties failed to reach a binding contract.

### C. *Shann's Rule 59(e) Motion*

The last remaining issue is the district court's denial of Shann's Rule 59(e) motion seeking amendment of the district court's judgment to require Dunk to return his $50,-000 deposit. We note only that the district court's justification for not deciding the merits of the motion is no longer applicable. The court stated that it could not rule on whether the deposit should be returned, in light of its finding that no binding contract existed, because Shann had failed to raise the issue before judgment was entered. Because we are vacating the judgment and remanding the case to the district court, Shann may amend his complaint to seek to recover his deposit and the court will have no reason to decline to rule on the issue.

### *Conclusion*

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings.