### In re MAXWELL COMMUNICATION CORPORATION, plc, Debtor.

### Robert MIRANDA, Plaintiff–Appellant,

### v.

### MAXWELL COMMUNICATION CORPORATION, plc, Defendant–Appellee.

Nos. 91 B 15741 (TLB), 95 Civ. 5323 (JGK).

United States District Court, S.D. New York.

July 19, 1996.

Leonard Benowich, Zivyak, Klein and Liss, New York City, for Appellant.

George Brandon, Milbank, Tweed, Hadley and McCloy, New York City, for Appellee.

### OPINION AND ORDER

KOELTL, District Judge:

The appellant, Robert Miranda, a former chief operating officer of Pergamon Press, Inc. ("Pergamon"), a subsidiary of the appellee, Maxwell Communication Corporation ("MCC"), appeals pursuant to 28 U.S.C. § 158 from the order of the Bankruptcy Court (Brozman, J.) granting MCC's motion for summary judgment and denying his motion for summary judgment.

On December 16, 1991, MCC filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. The appellant timely filed a proof of claim for $200,000 as a "premium bonus." Appellant alleges that he was promised the "premium bonus" for his work in the sale of Pergamon to Elsevier Acquisition Corporation ("Elsevier") and that MCC is contractually bound to pay it.

The Bankruptcy Court granted MCC's motion for summary judgment, denied Miranda's motion for summary judgment, and ordered Miranda's claim based on the "premium bonus" to be disallowed and expunged. The Bankruptcy Court found that there was no enforceable agreement to pay the premium bonus. Miranda now appeals from that order. For the reasons explained below, the order of the Bankruptcy Court is affirmed.

I.

The sale of Pergamon to Elsevier was announced on March 28, 1991, approved by

the shareholders of MCC on May 10, 1991, and completed on May 16, 1991. (D–106.)[1] At the time of the sale's completion, appellant was the associate publisher and chief operating officer of Pergamon.

Before the sale of Pergamon to Elsevier, appellant alleges that at a February 15, 1991, meeting with Kevin Maxwell, the Joint Managing Director of MCC and an officer and director of Pergamon, and Sheldon Aboff, an employee of MCC, Maxwell stated that he had "committed . . . a bonus pool of $1 million . . . established by MCC to pay premium bonuses for those people whose services and cooperation would be essential to the efficient sale and smooth transition of Pergamon." (D–93 ¶ 4.) It is disputed by the parties whether Maxwell did or did not specifically identify Miranda and Aboff as future recipients of bonuses, but it is not disputed that the amounts of the bonuses were not discussed.

Appellee claims that those persons who were to receive premium bonuses from the pool were first tentatively identified in a Memorandum dated May 9, 1991 (the "Pergamon Memorandum"). The appellant drafted the Pergamon Memorandum on the letterhead of Pergamon, dated it May 9, 1991, and addressed it to Kevin Maxwell. The subject of the Pergamon Memorandum described in the "re" line is as follows:

> Discussion held with Shelly Aboff and myself concerning individuals in the long term affiliation with the company, as well as those people involved in the sale aspects of the Tokyo project [codename for the acquisition of Pergamon].

(D–31.)

The body of the Pergamon Memorandum reads:

> The amount of money allocated for premium bonuses during our conversation is $1.M. The people that should be in a position to receive a major portion of this money would be:
>
> Shelly Aboff

Robert Miranda . . .

(D–31.)

The Pergamon Memorandum lists four people and then another five after the notation "and in lesser amounts." It is alleged that after a conversation with Maxwell, Sheldon Aboff wrote in a series of figures next to the names listed in the Pergamon Memorandum, including $500,000 for himself and $200,000 for the appellant, in all totalling $845,000, and that Maxwell thereafter signed the document with those additions.

Appellant alleges that following the Pergamon Memorandum, he performed his part of the bargain by entering into the "Tri–Party Agreement" with MCC and Elsevier, under which he became Elsevier's "general manager" of Pergamon through the end of 1991. (D–64–66.) Both MCC and Elsevier were to compensate Miranda for his work to ensure a smooth transition of ownership. The Tri–Party Agreement is silent with regard to the premium bonus discussed in the Pergamon Memorandum. On May 20, 1991, Miranda also entered into an employee agreement with Macmillan, an MCC controlled entity, providing for his future employment with that company. (D–107.) This employment agreement is also silent as to the premium bonus.

In the fall of 1991, David Shaffer, an MCC director and president of Macmillan at the time, had a conversation with Kevin Maxwell in which Maxwell stated that he had not paid and would not pay any of the bonuses contained in the Pergamon Memorandum. (See D–112 ¶ 8.) In June, 1992, Miranda's employment with Macmillan was terminated and he was given a severance agreement. (D–20.) The June, 1992 severance agreement provided that Miranda would release all claims "arising out of or which are in any way related to [his] employment or the termination of [his] employment. . . ." (D–71.) The agreement provides, however, that ". . . the release provided herein shall be without prejudice to any claim that you [Miranda] may have, solely against Maxwell Communication Corporation, plc, arising out of the

---

1. References to "D–___" are to the page numbers of the record on Appeal as prepared by the plaintiff, Robert Miranda.

memorandum dated May 9, 1991 from you to Kevin Maxwell." (D–72.)

## II.

■ This Court reviews *de novo* the Bankruptcy Court's decision on a motion for summary judgement. *In re Sentinel Products Corp., PI*, 192 B.R. 41, 44 (N.D.N.Y.1996); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*, 194 B.R. 728, 731 (S.D.N.Y.1995).

■ Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *Gallo*, 22 F.3d at 1224.

■ The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether summary judgment is appropriate, a court must resolve all ambiguities against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223.

■ If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

■ If the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. at 1356. The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. The nonmoving party may not rest upon mere allegations or denials of the moving party's pleadings. *Anderson*, 477 U.S. at 248–249, 106 S.Ct. at 2510–11. Speculative and conclusory allegations are insufficient to meet this burden. *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir.1995); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

## III.

The first issue is whether there was a binding oral agreement requiring MCC to pay the appellant a premium bonus. Appellant alleges on appeal that Kevin Maxwell orally made an "offer" in February, 1991, which was accepted by Miranda's subsequent performance. (*See* Appellant's Br. at 3–4). Maxwell's purported oral "offer" in February, 1991 was to establish

> a bonus pool of $1 million ... by MCC to pay premium bonuses for those people whose services and cooperation would be essential to the efficient sale and smooth transition of Pergamon.

(D–93 ¶ 4.)

■■ This alleged oral agreement is unenforceable because it is undisputed that it did not contain the most basic essential term—the amount of the bonus to be paid to Miranda. Before an offer can be accepted,

its terms must be definite and certain. *S.S.I. Investors, Ltd. v. Korea Tungsten Mining Co.*, 80 A.D.2d 155, 161, 438 N.Y.S.2d 96, 101 (1st Dep't 1981), *aff'd*, 55 N.Y.2d 934, 449 N.Y.S.2d 173, 434 N.E.2d 242 (1982).

■ "As price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation." *Cooper Square Realty, Inc. v. A.R.S. Management, Ltd.*, 181 A.D.2d 551, 581 N.Y.S.2d 50, 51 (1st Dep't 1992). Without an agreement as to the amount of compensation, such an agreement is unenforceable. 181 A.D.2d at 551–552, 581 N.Y.S.2d at 51. In this case, there was no agreement regarding compensation because the appellant did not include the amounts of the premium bonuses to be paid to the various employees.

■ In general, preliminary manifestations of assent that require further negotiation do not ordinarily create binding obligations. *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996). However, the Court of Appeals for the Second Circuit has recognized that in certain rare circumstances, "if a preliminary agreement clearly manifests such intention, it can create binding obligations." *Shann*, 84 F.3d at 77. There are two types of preliminary agreements:

> Type I is where all the essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward the conclusion within the agreed framework.

*Shann*, 84 F.3d at 77.

Since compensation is an essential term in a services contract, the alleged February 9 agreement could not be a Type I agreement. Similarly, it could not be a Type II agreement because of the importance of the term that had concededly not been decided—the amount of the bonus. In *Shann* itself, the Court of Appeals recognized that there are terms so important that preliminary agreements are not binding. New York law acknowledges that the absence of the amount of compensation is such a term.

■ Similarly, applying the four factors traditionally applied to determine the binding nature of a preliminary agreement in examining whether there was a binding preliminary agreement in this case, the Bankruptcy Court concluded there was no agreement. The Bankruptcy Court was correct.

■ The Court of Appeals for the Second Circuit has articulated several factors to aid in determining whether parties intended to be bound in the absence of a document executed by both sides. A court is to consider:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985); *see R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir.1984); *see Reprosystem B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984).

The first factor is not applicable in this case because the negotiations, if the discussions between the appellant and Maxwell could be termed as such, had not risen to the level where either party had concluded that there would be an express reservation of the right not to be bound in the absence of a writing.

■ The second factor has not been satisfied in this case. "Partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group*, 751 F.2d at 75. An examination of the partial performance factor does not aid in establishing the existence of an oral agree-

ment with the appellant's employer. Any work that was performed by the appellant was compelled by his contracts with the different employers, and thus does not indicate that he was performing in order to obtain a bonus not contemplated by those agreements.

The third factor has not been satisfied. As discussed above, the parties had not settled all of the terms on which there was to be agreement. An essential term in a service contract is the amount of compensation, which had not been determined. There was no agreement between MCC and the appellant regarding the amount of compensation, if any, he was to receive for his work in the sale of Pergamon.

Finally, the agreement concerned the sort of complex business matters that are normally subject to a written contract. Miranda's employment and compensation agreements were in fact reduced to writing with the exception of the alleged premium bonus agreement. (Appellee's Br. at 20.) It would be atypical for Miranda to receive compensation in a manner that had not been concluded in writing.

Based on the four factor test of *Winston* and the analysis above, this Court agrees with the conclusion of the Bankruptcy Court that there was no binding oral contract to pay the appellant a $200,000 premium bonus.

## IV.

The second issue is whether the May 9, 1991, Pergamon Memorandum was an enforceable contract.

 By its terms, the Memorandum does not purport to be a contract between the parties, nor does it reflect an intent by the parties to be bound. The expressed words of the parties are phrased in the conditional, "the people that **should** be in a position . . . **would be** . . ." (D–31, emphasis added.) Thus, the Pergamon Memorandum does not reflect a definite agreement between the par-

ties, but rather tentative statements regarding the possibility of a bonus.

Moreover, there was no consideration for the alleged premium bonus. Appellant contends that the consideration for the bonus payment was "render[ing] all services required for the preparation for sale of Pergamon Press to Elsevier." (D–1 ¶ 3.) The appellant began working on the Pergamon sale in February, 1991, and it was publicly announced on March 28, 1991, conditioned upon shareholder approval. Shareholder approval was given on May 10, 1991, and the sale was completed on May 16, 1991. Since appellant's performance occurred before the Pergamon Memorandum, there was no consideration for the bonus.

On appeal, appellant contends that his work for Elsevier after the sale of Pergamon also serves as consideration for the bonus. (Appellant's Br. at 4.) Any work that was performed by the appellant for Elsevier after the sale was required by the Tri–Party Agreement in which Miranda was employed by Elsevier. The Tri–Party Agreement continued his previous salary and awarded him a bonus for service to Elsevier (D–64 ¶ 2), but does not make any reference to the Pergamon Memorandum or any other premium bonus.

New York's General Obligations Law § 5–1105 ("§ 5–1105") does not save the Pergamon Memorandum from being unenforceable because of the lack of consideration.[2]

 "To be enforceable pursuant to § 5–1105 of the General Obligations Law, the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." *Umscheid v. Simnacher*, 106 A.D.2d 380, 381, 482 N.Y.S.2d 295, 297 (2d Dep't 1984) (citations omitted). The Pergamon Memorandum does not fulfill the requirements of § 5–1105, because there is no unequivocal promise to pay a certain sum of money at a certain date. The "re" line of the Pergamon Memorandum

---

**2.** § 5–1105. Written promise expressing past consideration.

 A promise in writing and signed by the promisor or his agent shall not be denied effect as a valid contractual obligation on the ground that

consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

**70**

is filled with conditional statements, and no date at all is alluded to as the date for payment.

Accordingly, for all of the reasons stated above, this Court agrees with the decision of the Bankruptcy Court that the appellant has failed to establish the existence of a contract between MCC and the appellant requiring the payment of a $200,000 premium bonus.

### V. CONCLUSION

For all of the reasons stated above, the order of the Bankruptcy Court granting summary judgment in favor of the appellee, MCC, and denying summary judgment for the appellant, Robert Miranda, is affirmed. **SO ORDERED.**